**U.S. SHELTER
CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 356–85T.

United States Claims Court.

Oct. 22, 1987.

Ralph A. Muoio, Washington, D.C., attorney of record for plaintiff; Cary H. Hall, Jr., Greenville, S.C., of counsel.

David Gustafson, Washington, D.C., with whom were Michael C. Durney, Acting

Asst. Atty. Gen., Mildred L. Seidman, and W.C. Rapp, of counsel, for defendant.

## OPINION

NAPIER, Judge.

This is a tax refund case involving the "principal purpose" provision of Section 269 of the Internal Revenue Code of 1954,[1] and the effect of that section on plaintiff's federal income tax liability for the years 1979 and 1980.

Plaintiff, U.S. Shelter Corporation,[2] seeks a refund of certain amounts of income taxes it paid after the Internal Revenue Service performed an audit for those years.[3] As a result of the audit, the IRS made various adjustments to plaintiff's returns as filed, and assessed additional taxes above the amount which U.S. Shelter had paid when it initially filed its tax returns. Jurisdiction is founded under 28 U.S.C. § 1491.

The question at issue is whether the "principal purpose" of the 1979 corporate reorganization involving U.S. Shelter and First Piedmont Corporation (FPC) was tax avoidance, as the IRS found and as the Government contends. Plaintiff asserts that the primary purpose of the reorganization was to achieve non-tax motivated business goals, and that consequently, it was appropriate to offset FPC's losses against its gains entitling Shelter to a refund.

Trial was held April 27, 1987, through May 1, 1987, in Greenville, South Carolina.

1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

2. In the corporate reorganization which is the subject of this opinion, the name of the surviving entity (formerly First Piedmont Corporation) was changed to U.S. Shelter Corporation. U.S. Shelter, the non-surviving entity, changed its name to Amreal Corporation. By agreement of the parties during the litigation and in this opinion, First Piedmont Corporation, as it was known prior to the reorganization, is referred to as First Piedmont Corporation or "FPC". The corporation known as U.S. Shelter Corporation prior to the reorganization is referred to as "Old Shelter." First Piedmont Corporation, after the reorganization and after its name change, is

referred to as "New Shelter." The plaintiff in this action is the corporate successor of New Shelter. An understanding of the mechanics of the reorganization is critical in the reading of the opinion. The appendices following the opinion will aid in an understanding of the structure of FPC and Old Shelter prior to the reorganization and the structure of New Shelter, the company which was the product of the reorganization.

3. In the complaint filed June 13, 1985, plaintiff's claim for a refund was $4,370,009.44. On April 14, 1987, plaintiff and defendant filed a stipulation for partial dismissal, with prejudice, as to disallowances of deductions of $665,989 and $1,057,099 for 1979 and 1980, respectively, based upon a computational error.

Plaintiff presented eight witnesses at the trial and defendant called twelve, four of whom were initially called by plaintiff. The post trial briefing was completed on July 7, 1987.

For the following reasons, the Court concludes that plaintiff has met its burden of proving that the principal purpose of the reorganization was business motivated rather than tax motivated. Accordingly, U.S. Shelter is entitled to a refund.

## I. GENERAL LEGAL BACKGROUND

### A. Net Operating Losses

Tax liability is measured on an annual basis. Each year, a taxpayer's income for the applicable twelve month period is added up, certain expenses for that year are deducted, and the taxable income for the period is thus calculated. If the tax system were implemented on a strictly annual basis, losses and gains accruing in one year would have no effect on those occurring in another year.

Congress, however, has provided for some leveling and thus deviated from a strictly annual system. Section 172 of the Code provides that net operating losses from one year may (1) be carried back to reduce taxable income for past years and, (2) be carried forward to reduce taxable income for future years. Although this section is subject to certain limitations, its overall effect is to enhance business management and planning by minimizing sharp fluctuations in taxes from one year to the next. The provision helps to ensure that a taxpayer with fluctuating income and losses will, over time, bear a tax liability in proportion to its average income level.

### B. "Trafficking" in Losses

Unfortunately, permitting losses to be carried forward creates the potential for so-called "trafficking" in loss carryovers. That is, if a corporation incurring losses

(loss corporation) can accumulate those losses and carry them forward into future years, then it may attract the interest, by way of acquisition, of a profitable corporation. The profitable corporation would naturally like to reduce its taxable income by means of losses—painless to itself—that were incurred at an earlier time by someone else. If the profitable corporation can acquire (or be acquired by) the loss corporation and report those losses on its own tax return, it will have done just that.

### C. Section 269

The Code, however, contains several provisions designed to prevent this sort of abuse, notably Section 382,[4] which is not at issue in this case, and Section 269, which is at issue here.

Section 269 found its inception in the Revenue Act of 1943. Following the enactment of the excess profits tax law in 1940, a market developed where failing businesses became attractive targets for profitable businesses since the net operating losses of the former could be transferred to the latter.[5] This was true even if the two businesses were not operationally compatible and could not be integrated. Section 269 was designed as a deterrent measure, "to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability." H.R.Rep. No. 871, 78th Cong., 1st Sess. 49 (1943).

The Senate Report accompanying the Revenue Bill of 1943 elaborated on the need for the legislation:

> The objective of the section [269] . . . is to prevent the distortion through tax avoidance of the deduction, credit, or allowance provisions of the code, particularly those of the type represented by the recently developed practice of corpora-

---

**4.** Broadly speaking, Section 382(a), as in effect during the years in suit, prevented the use of loss carryovers where corporate control was "purchased" and the business was changed, and Section 382(b) limited the use of carryovers where the loss corporation's stockholders owned less than a certain percent of the stock after the reorganization.

**5.** Rudick, *Acquisitions to Avoid Income or Excess Profits Tax: Section 129 of the Internal Revenue Code,* 58 Harv.L.Rev. 196 (1944).

tions with large excess profits ... acquiring corporations with current past, or prospective losses or deductions, ... for the purpose of reducing income and excess profits taxes.

S.Rep. No. 627, 78th Cong., 1st Sess. 58 (1943).

Further, the Senate and the House noted that the legal effect of Section 269 was to codify the general principle set forth in *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940) "as to the ineffectiveness of arrangements distorting or perverting deductions, credits, or allowances so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which they were provided." S.Rep. No. 627, 78th Cong., 1st Sess. 58 (1943).

Section 269(a) provides:

If—

(1) any person or persons acquire, ... directly or indirectly, control of a corporation, or

(2) any corporation acquires, ... directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance.

The reorganization in this case involves two distinct acquisitions. Thus, the Court must first determine whether either acquisition had, as its "principal purpose," the "avoidance of Federal income tax by securing the benefit of a deduction [*i.e.*, net operating loss carryover], [or] credit [*e.g.*, an investment tax credit carryover]...." I.R.C. § 269(a)(2). Old Shelter's acquisition

of 80 percent control of FPC fits in subsection (1) above, while FPC's acquisition of Old Shelter's assets falls within subsection (2).

In *Stange Co. v. Commissioner*, 36 T.C. M. (CCH) 31 (1977), the United States Tax Court (Tax Court) was faced with two interrelated transactions that arguably fell within both subsections of Section 269(a). The Tax Court decided to look to "the purposes of the overall plan." *Id.* at 37. Adopting the rationale of that Court, if the "principal purpose" of either acquisition was tax avoidance, then one company may not use the other's losses and/or credits for its own benefit, *i.e.*, U.S. Shelter would not be entitled to use the FPC losses and credits.

■ Section 269 requires a determination of the intent or "principal purpose" of the corporate parties when entering into such a transaction. In order to make such a determination, it is necessary to ascertain the intentions and motives of the officers and directors of the corporate parties at the time of the transaction. Although objective evidence must be presented to support the taxpayer's case, the testimony of such witnesses, as well as others instrumental in structuring the transaction, is critical.

## II. WITNESSES

The following individuals were key figures in the reorganization of Old Shelter and First Piedmont Corporation. Each testified at trial and their background, position and involvement in the reorganization are important factors in the case and permit an easier reading of the opinion:

*N. Barton Tuck, Jr.* Tuck, one of the primary founders of U.S. Shelter in 1972, was chief executive officer (CEO) of Old Shelter prior to the reorganization. He was the principal spokesman for Old Shelter in the negotiations with FPC for the reorganization and today serves as Chairman and Chief Executive Officer of U.S. Shelter Corporation (New Shelter). He became CEO of New Shelter upon consummation of the reorganization. Prior to the formation of U.S. Shelter,

Tuck had worked as a certified public accountant and as a stockbroker and financial consultant. Tuck has served on the board of numerous community organizations and is past president of the Greater Greenville Chamber of Commerce.

*Buck Mickel.* Mickel was chairman of Old Shelter's Board of Directors at the time of the reorganization and became Chairman of New Shelter's Board of Directors when the reorganization was consummated. Mickel was vice chairman of the Board and member of the Office of the Chief Executive of Fluor Corporation. He previously served as president and vice chairman of the Fluor Corporation, a Fortune 500 Company. He is also a director and former chairman of Daniel International Corporation which was acquired by Fluor Corporation in 1977. Mickel has served on the boards of numerous corporations and universities. He is active in various community activities in Greenville.

*C. Thomas Wyche.* Wyche was, at the time of the reorganization, and still is, a member of the law firm of Wyche, Burgess, Freeman and Parham, P.A. At the time of the reorganization, he was a director of Old Shelter, and he became a director of New Shelter upon consummation of the reorganization. Wyche has served on the boards of several corporations and community organizations in the Greenville area.

*Edmund D. Cronin, Jr.* Cronin was, at the time of the reorganization, president of H.G. Smithy (one of Old Shelter's businesses not transferred to FPC in the reorganization) and a director and shareholder of Old Shelter. After the reorganization, he became a director of New Shelter. Cronin is currently Chairman of the Board and Chief Executive Officer of Smithy Braedon Company, a real estate service organization in the Washington, D.C. area. Cronin has served as a director for several corporations and is currently President of the Greater Washington Board of Trade.

*Walter Clark.* Clark was president of First Piedmont Corporation prior to the reorganization and was the principal spokesman for FPC in negotiations with Shelter for the reorganization. After the reorganization, Clark became a director of New Shelter, and since 1983 he has been the President of Equipment Leasing, a division of American Federal Bank. In addition, Clark has served on the boards of several civic and business organizations in the Greenville area.

*William H. Orders.* Orders was chairman of the board of First Piedmont Corporation prior to the reorganization and became a member of New Shelter's board upon consummation of the reorganization. Orders is currently President of Orders Distributing Company, Inc., and a director of ORDERREST, INC., located in Greenville. Orders is a past president of the National Association of Floor Covering Distributors and has served on the boards of many civic and business organizations in the Greenville community.

*William N. Page.* Page was executive vice president and a board member of First Piedmont Corporation prior to the reorganization. He became Executive Vice President of New Shelter when the reorganization was consummated, a position which he holds today. Previously, Page served as president of First Piedmont Corporation and as vice president and treasurer of CRYOVAC, a division of W.R. Grace and Company. Page has served on the boards of many civic and educational organizations and was awarded the Order of the Palmetto (South Carolina's highest award) by Governor Richard Riley in 1987.

*Gary Pompan.* Pompan was, at the time of the reorganization, a member of Ernst and Whinney's national office and, as such, submitted to the Internal Revenue Service a Request for Ruling as to the income tax consequences of the reorganization. Pompan's education includes a law degree as well as a masters in law. Prior to his association with Ernst and Whinney, Pompan spent four years working for the Internal Revenue Service's Corporation Division, Reorganiza-

tion Branch in Washington, D.C. As a tax law specialist, Pompan was involved in the issuance of private letter rulings to taxpayers on transactions involving reorganizations, restructurings, spinoff transactions, and foreign reorganizations.

*James M. Shoemaker.* Shoemaker was a member of the law firm of Wyche, Burgess, Freeman and Parham, P.A. at the time of the reorganization. He continues to be a member of that firm and specializes in general corporate securities law. He was the principal attorney involved in the securities law aspects of the reorganization.

*James A. Aston, Jr.* Aston is a certified public accountant. As an employee of Shelter's accounting firm, Ernst and Whinney, he participated in the annual audit of Old Shelter and New Shelter for the years 1976 through 1986. In February 1986, he accepted employment with Shelter and is presently its Chief Financial Officer.

*Carroll Lindsey.* Lindsey was chief financial officer of Old Shelter and New Shelter from 1972 through 1986, at which time he left the employ of the company.

*Harold A. Carey, Jr.* Carey has been an employee of Equipment Leasing since 1973. In 1979, the year of the reorganization, Carey was senior vice president of the company.

*Donald R. Waldrop.* Waldrop was in charge of Shelter's syndication department from 1972 through 1986, when he left the company. In early 1979, he was executive vice president of U.S. Shelter.

*Gerald Reynolds.* Reynolds was hired to be the president of Computer Resources after the agreement for the reorganization was reached. He served in that capacity until 1984, at which time he left the company.

*Albert Gossett.* Gossett was an employee of Computer Resources prior to the reorganization. He continued as such and became an officer of Computer Resources after the reorganization. He is now the Director of Shelter's Management Information Systems Division.

*Henry Robertson.* Robertson was a vice president of First Piedmont Mortgage prior to the reorganization and continued as such after the reorganization. Robertson was in charge of the management, development and disposition of First Piedmont Mortgage's real estate portfolio.

## III. FACTS

### A. FPC Prior to the Reorganization

First Piedmont Bank & Trust Company (First Piedmont Bank) was organized as a state banking association in 1968. First Piedmont Corporation was organized as a business corporation under the laws of South Carolina in 1969, pursuant to a plan of reorganization instituted by First Piedmont Bank. Upon consummation of the reorganization in 1969, First Piedmont Bank became a wholly owned subsidiary of First Piedmont Corporation, and the former shareholders of First Piedmont Bank became the shareholders of FPC. The common stock of FPC was publicly traded in the over-the-counter market. This reorganization was designed to create a holding company which could offer a broad range of financially related services. In addition to controlling the banking services of First Piedmont Bank, FPC formed and acquired subsidiaries to engage in the following lines of business: (a) equipment leasing, operated and managed by Equipment Leasing Corporation of South Carolina, First Piedmont Leasing, and Falco Corporation; (b) data processing, operated by Computer Resources, Inc.; (c) mortgage banking, managed by First Piedmont Mortgage Company, Inc.; (d) travel services, under the direction of First Piedmont Travel; (e) lending venture capital, managed by First Piedmont Capital Corporation; (f) management consulting, managed by First Piedmont Management Group; and (g) insurance, operated by First Piedmont Insurance Agency.

Of the various businesses launched by FPC, several failed or never became profitable enough to continue. In late 1972 or early 1973, FPC hired an employee to undertake First Piedmont's proposed venture capital business through First Piedmont

Capital Corporation, a wholly owned subsidiary established for that purpose. However, it did not generate enough business to support its own staff, and the operation became inactive two years thereafter. FPC also entered into a joint venture with a retired executive, who was one of its directors, to undertake a proposed management consultant business using the name of First Piedmont Management Group in 1971. However, the executive's efforts did not generate fees for FPC, so, while his activities remained a potential source of income, no material effort was expended by FPC regarding this business. FPC sold First Piedmont Travel in 1976, and First Piedmont Insurance Agency never became active. FPC also sold the mortgage servicing and placement business of First Piedmont Mortgage as of January 1, 1977, while retaining its existing loan portfolio.

In 1976, Old Shelter and a number of its shareholders and directors became partners in First Investment Group, a partnership formed for the purpose of making a $1 million loan to FPC. The loan was secured by pledge of the stock of Equipment Leasing and Computer Resources. The participating members were:

|  | Capital Contribution |
|---|---|
| Old Shelter | $100,000 |
| C.T. Wyche (Director & Shareholder) | 25,000 |
| Hunter Park (Director; Non–Shareholder) | 25,000 |
| Wyche, Burgess, Freeman & Parham, P.A. (Outside Counsel) | 50,000 |
| James M. Shoemaker (Shareholder) | 50,000 |
| Buck Mickel and family (Director & Shareholder) | 100,000 |

On March 16, 1977, First Piedmont Bank sold all of its assets and liabilities to First Citizens Bank & Trust Company of South Carolina for $4 million in cash. Prior to the March 1977 sale, First Piedmont Bank had been FPC's principal asset.

Following the sale of the bank's assets in 1977, FPC embarked upon a rebuilding program.

The sale of the banking business of First Piedmont Bank and the servicing and placement portion of First Piedmont Mortgage in 1977, along with infusions of additional capital in the form of loans of $1 million by First Investment Group and $1,760,000 from another group of lenders, provided adequate liquidity for the satisfaction of the company's immediate obligations.

Immediately prior to the reorganization at issue in this case, FPC's principal activities consisted of the following: the operation of an equipment leasing business through Equipment Leasing Corporation, First Piedmont Leasing and Falco Corporation; the operation of a data processing service bureau through Computer Resources, Inc.; and the liquidation of a mortgage and real estate portfolio through First Piedmont Mortgage.

FPC had acquired Equipment Leasing Corporation of South Carolina in December 1969, and Falco Corporation in February 1971. At the time of the reorganization, these two wholly owned subsidiaries conducted business as Equipment Leasing, out of an office located in Greenville, South Carolina. Equipment Leasing was a general equipment lessor offering "net finance" leasing services. Lease financing, the sole service offered by Equipment Leasing, was available to all types of businesses, with marketing confined principally to the tri-state area of South Carolina, North Carolina and Georgia. The leases covered such diverse items as production equipment for the printing, metal working, textile and other industries, construction equipment, accounting and data processing machines, machine tools, medical and dental equipment, office equipment, furniture and fixtures, aircraft and automobiles and trucks.

Equipment Leasing competed primarily with other local and national leasing companies as well as with commercial banks, most of which were substantially larger than, and had greater financial resources than, Equipment Leasing. Equipment Leasing was dependent on regional and

national banks to provide funds with which it could purchase the equipment to be leased. The availability of funds depended almost entirely on the conditions of the money market at a given time. The great majority of Equipment Leasing's leases were financed with "matched funds," *i.e.,* Equipment Leasing would finance the purchase of equipment with a fixed rate installment loan from a bank and lease the equipment to a customer under a lease agreement that matched the term of the installment loan and provided Equipment Leasing with a profit in the "spread" between the interest rate of the lease and the interest rate on the installment loan. This spread was relatively constant and accordingly, Equipment Leasing's profitability was directly related to the volume of leases which it entered into. Equipment Leasing's bad debt losses averaged about 1 percent of its portfolio, except during 1976, when losses constituted 2.5 percent of its portfolio.

After 1974, Equipment Leasing suffered a reduction in the volume of business, due, in part, to restricted lending policies of its financing banks, which in turn was caused partly by First Piedmont Mortgage's activities. Poor real estate conditions and high interest rates had caused some of the assets in the mortgage portfolio to decline in value while liabilities with short maturities remained intact. Essentially, the liquidity and profitability of FPC and all of its subsidiaries were adversely affected, since banks were less willing to lend to entities associated with FPC and available funds had to be diverted by FPC to service the mortgage portfolio. After 1978, the availability of financing improved somewhat and the lease portfolio increased. Old Shelter had entered into two leases with Equipment Leasing in 1978, involving total original cost of $280,755.

Equipment Leasing's gross revenues, book income and taxable income for the period 1974 through 1979 were as follows:

| ($000) | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|
| Gross Revenues | 1760 | 1488 | 1009 | 758 | 749 | 986 |
| Book Income | 66 | 74 | (291) | (31) | 21 | 46 |
| Taxable Income | (440) | 216 | (26) | 307 | 212 | (73) |

Computer Resources, Inc., an 80 percent owned subsidiary of FPC, had been engaged in a data processing service business since its organization in 1968. Computer Resources provided a broad range of data processing services for its customers, including processing of payrolls, accounts receivable, accounts payable, general ledger accounts and related financial statements, inventory control, cash analysis, sales analysis, and most other jobs for which instant access to details was important. Immediately prior to the reorganization, Computer Resources had approximately 130 customers in a wide variety of retail, manufacturing, and service businesses. In 1977, Computer Resources installed new computer equipment which gave it the capability of providing on-line data processing. The company was staffed and overhead was increased to support the larger volume of business which had been anticipated with the implementation of this new equipment and capability. Operation of the new equipment, however, was met with unexpected difficulties which prevented the realization of an increase in anticipated earnings. By the end of 1978, however, FPC believed these problems had been substantially eliminated. Prior to the reorganization, Computer Resources was the only service bureau in the marketing area offering a complete on-line service. It operated primarily within a 30–mile radius of Greenville, South Carolina. Computer Resources' gross revenue, book income, and taxable income in the period 1974 through 1979 were as follows:

| ($000) | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|
| Gross Revenues | 610 | 503 | 518 | 654 | 773 | 1161 |
| Book Income | 169 | 94 | 22 | 152 | 73 | 13 |
| Taxable Income | 150 | 88 | 143 | 143 | 40 | (6) |

First Piedmont Mortgage Company, Inc., a wholly owned subsidiary of FPC, was organized in January 1972, and was also located in Greenville, South Carolina. During the five years following its inception, the company was engaged in the business of originating, selling, and servicing commercial and industrial mortgage loans, and performing other incidental activities necessary to conduct a mortgage banking business. In addition to providing loans for its own account, the mortgage company arranged mortgage loans for, or sold such loans to, insurance companies, commercial banks, real estate investment trusts, and savings and loan associations.

In 1973 and 1974, First Piedmont Mortgage invested a substantial portion of its assets in real estate mortgage loans. The financing source for these loans was primarily short-term. The widely fluctuating interest rates and corresponding depression in the real estate market that took place thereafter caused a number of First Piedmont Mortgage obligors to default on their loans, and after January 1977, First Piedmont Mortgage began foreclosing on the properties that had secured the faulted loans. After the January 1977 sale of the servicing and placement business, First Piedmont Mortgage's activities consisted of a program to liquidate its portfolio of loans in real estate holdings.

On the date of the reorganization, First Piedmont Mortgage's portfolio consisted of loans receivable, notes receivable, and real estate. As of November 30, 1979, the closest date for which information is available, the loans and notes had an aggregate book value of $4,792,920. As of December 31, 1979, the closest date for which financial information is available, the real estate properties had an aggregate book value of $4,829,724.

First Piedmont Mortgage's loan portfolio had been financed to a large degree by loans from FPC. At the time of the reorganization, First Piedmont Mortgage had a total outstanding indebtness of $8,474,442 to FPC and $4,120,354 to unrelated parties. Interest was charged by FPC on the intercompany debt, and the intercompany interest charges were reflected in First Piedmont Mortgage's book and taxable income. First Piedmont Mortgage's gross revenues, book income, interest on debt to its corporate parent, and taxable income in the period 1974 through 1979 were as follows:

| ($000) | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|
| Gross Revenues | 2006 | 2068 | 1444 | 794 | 807 | 655 |
| Interest on Debt to Corporate Parent | | | | 817 | 847 | 884 |
| Taxable Income | 280 | 65 | (3975) | (301) | (433) | (842) |
| Book Income | 297 | 69 | (3975) | (402) | (433) | (458) |

The total consolidated loss carryover for FPC as of December 31, 1979, originated with First Piedmont Mortgage Company.

### B. Old Shelter Prior to the Reorganization

Prior to the reorganization, Old Shelter was a South Carolina corporation, organized in 1972, with its principal place of business in Greenville, South Carolina. Old Shelter was engaged in a number of businesses, including residential property management, real estate development, and real estate syndication (principally, syndication of apartment projects), and was the managing general partner of over 100 real estate limited partnerships. In addition to

the businesses operated directly by Old Shelter through its various divisions, Old Shelter owned several subsidiaries. The businesses conducted by the subsidiaries included, among others, a business which rented furniture and office equipment (Tempo Leasing Corp.), a mortgage banking business (Mid–South Mortgage Company), an insurance brokerage business (Sullivan Insurance Company), and a real estate business headquartered in Washington, D.C. (H.G. Smithy Co.).

Before the reorganization Old Shelter was closely held, with all of its common stock owned by twenty-four shareholders. The following four shareholders owned, directly and beneficially, approximately 67 percent of the outstanding common stock of Old Shelter:

|  | Percentage of Common Stock |
|---|---|
| N. Barton Tuck—President | 25.6 |
| Edmund B. Cronin—Director, President, H.G. Smithy Co. | 15.0 |
| Buck Mickel, Director | 15.3 |
| C.T. Wyche, Director | 11.1 |

FPC owned (through one of its subsidiaries), prior to the reorganization, 2,415 shares of Old Shelter's common stock and 3,097 shares of Old Shelter's preferred stock.

Old Shelter commenced its property management business in 1972 with the management of 232 units of multi-family apartments. As of August 1979, Old Shelter managed approximately 212 multi-family apartment projects comprising approximately 26,500 multi-family units. Old Shelter had added in the past, and intended to add in the future, additional units under management through the acquisition of management companies. Such acquisitions normally would entail payment for anticipated revenues. Old Shelter would undertake such acquisitions where the long-term profit potential was expected to be consistent with the profitability of Old Shelter's existing management business.

In 1972, personnel of Computer Resources, the data processing subsidiary of FPC, had developed for Old Shelter a computerized control system which provided its property managers with information to facilitate the monitoring of income and expenses. This was a "batch mode" system under which Shelter would deliver raw data to Computer Resources, which in turn would feed the data into its computer system and then deliver periodic computer reports upon request by Old Shelter. Although Old Shelter was a customer of Computer Resources in the early 1970's, in 1975 it took its business to Computerecords, a competing computer service bureau in Greenville.

Old Shelter's syndication department was engaged in acquiring real estate for the purpose of making private placements with clients. The syndication department, which consisted of five persons, analyzed proposed projects, identified suitable projects (including projects developed by the Old Shelter construction and development business), negotiated a price and terms with the owner, and formed limited partnerships to purchase projects with investors' funds. It also supervised the administrative, accounting, and legal functions relating to the acquisition of projects and the sale of interest therein.

Old Shelter operated a registered broker-dealer through its wholly owned subsidiary, Shelter Securities, Inc., in order to facilitate the sale of limited partnership interests to investors.

Old Shelter's insurance agency business began in late 1974, and operated through the Sullivan Company, Inc., as a wholly owned subsidiary of Old Shelter. The insurance agency had its main office in Greenville and branch offices in Columbia and Charleston, South Carolina. Twenty-four persons were employed by the agency

making it one of the largest general insurance agencies in South Carolina. As of 1979, approximately 20 percent of the Sullivan Company's premium collection was generated by Old Shelter related businesses. It had agency contracts with approximately twenty-five insurance companies and had approximately 2,650 customers.

Old Shelter had been engaged in the construction and development business since 1973. Initially, these activities consisted of the completion of projects syndicated by Old Shelter which experienced difficulties during the construction phase, as well as renovation and repair of projects managed by Old Shelter. In 1977, Old Shelter's construction and development activities were expanded to include apartment projects. As of 1979, Old Shelter's construction and development business contemplated the continued development and construction of one or two conventionally financed apartment projects (150 to 300 unit size) per year and the continuation of renovation and repair construction work for projects managed by Old Shelter.

The following table shows the gross revenue and earnings before taxes of the Old Shelter businesses that were to be transferred to FPC in the reorganization, for the two years preceding the reorganization:

| ($000) GROSS REVENUES | Year Ended December 31, | | Six Months Ended June 30, |
| --- | --- | --- | --- |
| | 1977 | 1978 | 1979 |
| Property Management | $1,931 | $2,420 | $1,527 |
| Construction and Development | 1,297 | 3,222 | 1,309 |
| Real Estate Syndication | 613 | 645 | 340 |
| Insurance | 456 | 900 | 504 |
| Other | | 101 | 26 |
| | $4,297 | $7,288 | $3,706 |

| ($000) OPERATING PROFIT | | | |
| --- | --- | --- | --- |
| Property Management | $519 | $761 | $494 |
| Construction and Development | 45 | 191 | 14 |
| Real Estate Syndication | 283 | 203 | 112 |
| Insurance | 73 | 255 | 89 |
| Other | | | |
| | 920 | 1,410 | 709 |
| Corporate Expense | (209) | (462) | (256) |
| Interest Expense | (85) | (150) | (133) |
| Other Income | | 101 | 27 |
| EARNINGS BEFORE TAXES | $626 | $899 | $ 347 |

## C. The Agreement

■ There is no dispute as to the mechanics of the reorganization. Early in 1979, Clark, President of First Piedmont Corporation (FPC), a publicly held corporation, approached Tuck, President of U.S. Shelter (Old Shelter), a closely held corporation, to discuss the possibility of combining the two companies. Negotiations ensued which ultimately resulted in an agreement on July 26, 1979, for reorganization between the two companies. On November 16, 1979, FPC exchanged 80.1 percent of its stock for certain assets and businesses of U.S. Shelter Corporation.[6]

Upon receiving the stock of First Piedmont Corporation, U.S. Shelter distributed it to its shareholders *pro rata*, in accordance with their percentage ownership of U.S. Shelter. Following this reorganization, First Piedmont Corporation changed its name to U.S. Shelter Corporation, and U.S. Shelter changed its name to AmReal Corporation.[7]

■ The transfer of assets from Old Shelter to First Piedmont, followed by the distribution of First Piedmont/New Shelter stock to Old Shelter shareholders constituted a tax-free reorganization within the meaning of Section 368(a)(1)(D) of the Internal Revenue Code. FPC and Old Shelter had requested and received from the

6. In form, FPC acquired assets of Old Shelter and changed its name. However, it acquired those assets in return for giving 80 percent of its stock to Old Shelter, which then passed the stock to its shareholders. Thus, the shareholders of Old Shelter owned 80 percent of the stock in a company which consisted mostly of the assets of Old Shelter and of which the former FPC was a small part. In effect, the Old Shelter shareholders had acquired 80 percent control of FPC in return for surrendering 20 percent ownership of the Old Shelter assets that FPC acquired. For this reason, plaintiff itself has treated the reorganization as an acquisition of FPC by Old Shelter. In any case, Section 269 applies whether the loss corporation is the acquired corporation or the acquiring corporation. *See F.C. Publication Liquidating Corp. v. Commissioner*, 304 F.2d 779, 781 (2nd Cir.1962).

7. *See* Footnote 2, *supra*.

Internal Revenue Service a favorable private letter ruling regarding some of the federal income tax consequences of the reorganization.[8] Thus, the provisions of Section 368(a)(1)(D) of the Internal Revenue Code are not at issue in this case.

The Old Shelter/FPC Reorganization Agreement provided that FPC would issue 3,918,775 shares of its common stock (amounting to 80.1 percent of the then total issued in outstanding stock) to Old Shelter in exchange for Old Shelter's transfer to FPC of the following businesses and assets: (a) Old Shelter's property management business, (b) Old Shelter's syndication business, (c) Old Shelter's construction and development business, (d) all of the stock of Sullivan Company, Inc., a subsidiary conducting an insurance brokerage business, (e) all of the stock of Shelter Securities Inc., a registered broker/dealer subsidiary, (f) all of the stock of Shelter Development, Inc., (g) $177,624 of accounts receivable from managed apartment projects, (h) certain options on real estate, (i) notes receivable from certain real estate projects, amounting to $705,500, (j) 28.25 acres of land in Atlanta, Georgia, valued at $653,884, (k) 4,891 shares of stock in First Palmetto State Bank, valued at $54,681, (*l*) automobiles, office equipment and other fixed assets having a fair value of $181,944, (m) certain insurance policies, and, (n) all of the stock of Foxfire Investors, Inc., which owned a 25 percent partnership in Foxfire Limited Partnership and a $400,000 note receivable from that partnership. In addition, Old Shelter agreed to change its name to USS Corporation. Later, however, Old Shelter was renamed AmReal.[9]

Under the Reorganization Agreement, Old Shelter retained its business of operating as managing general partner of limited partnerships and retained ownership of H.G. Smithy Company, Tempo Leasing Company, Inc., and Mid-South Mortgage Company, Inc. It was further agreed that a new Board of Directors would be elected for New Shelter, consisting of nine persons, of whom two had been directors of FPC and seven had been directors of Old Shelter. Clark and Orders, both of whom testified at the trial, were the two FPC directors who remained as directors of New Shelter. Clark remained a director of New Shelter until 1983, and Orders continues to be a director of New Shelter.

In August 1979, in contemplation of the reorganization, Old Shelter hired the American Appraisal Company of Milwaukee, Wisconsin, to appraise the value of certain assets and businesses. The assets and businesses which were transferred to FPC in the reorganization were appraised as follows: the Sullivan Group, (including Sullivan Company, Inc., Home Builders Coverage Group, Inc., and Edins–Turbeville Agency, Inc., a group of independent insurance agencies), was appraised as having a value of $1.5 million; the Old Shelter property management business was appraised as having a value of $4.8 million; and Foxfire Investors, Inc., a holding company, was appraised as having a value of $730,000. Old Shelter and FPC valued the following assets, which were transferred from the former to the latter in the reorganization: apartment management business, $4,800,000; insurance business, $1,500,000; Foxfire Investment, $730,000; and book value of other businesses and assets, $718,595. The total of these assets amounted to a net book value of $1,168,238 as of June 30, 1979. The net book value of FPC as of June 30, 1979, was $1,838,000 and as of November 30, 1979, was $1,717,000.

## IV. DISCUSSION

### A. The Bobsee Aggregation Rule

A threshhold issue in this action requires interpretation of the term "principal pur-

---

8. In the private letter ruling, the Internal Revenue Service ruled that the transfer of assets by Old Shelter to FPC, followed by the distribution of FPC stock to the Old Shelter shareholders, constituted a tax-free reorganization within the meaning of Section 368(a)(1)(D), so that Old Shelter did not recognize gain with respect to the transfer of assets to FPC and the Old Shelter shareholders did not recognize gain with respect to their receipt of FPC stock. The ruling request was prepared by the accounting firm of Ernst & Whinney, with assistance from the law firm of Wyche, Burgess, Freeman & Parham, P.A. Ernst & Whinney was Old Shelter's accounting firm. Until the reorganization was finally approved in 1979, a different accounting firm advised FPC.

9. See Footnote 2, *supra*.

pose," as used in Section 269 of the Code. Plaintiff and defendant disagree on the law to be applied.[10]

Judicial interpretation of the term "principal purpose" requires (1) an inquiry into the intent of the legislature when the statute was adopted, (2) an inquiry into subsequent regulations promulgated by the executive agency (Secretary of the Treasury) and their compatibility with the legislative intent, and (3) an analysis of previous judicial decisions and their applicability to the facts in the case before the Court.

■ Treasury Regulation 1.269–3(a) (1962) provides the following guidance for making a proper determination of the meaning of "principal purpose."

If the purpose to evade or avoid federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of Section 269 which would not have been made if the evasion or avoidance purpose was not present. The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom.

It is clear that Section 269 and the accompanying regulations distinguish between tax purposes and non-tax purposes. What is less clear is how non-tax purposes should be treated when compared to tax purposes in determining the "principal purpose" of the transaction. Specifically, should non-tax purposes be aggregated or segregated when compared to the tax purposes of the transaction? For instance, in the case at hand, suppose that Old Shelter was motivated to consummate the FPC reorganization for the following reasons:

(1) A 33 percent motive to become a publicly traded company;

(2) A 33 percent motive to acquire the assets of FPC, primarily, Computer Resources, Equipment Leasing and the mortgage portfolio;

(3) A 33 percent motive to use the net operating loss carryover of FPC; and

(4) A 1 percent motive to acquire "good will."

In this situation, did Old Shelter have one business purpose, to improve its competitive position, or did it have two separate purposes, (1) to become a publicly traded company, and (2) to acquire FPC's assets?

The regulation appears to aggregate tax avoidance motives and to segregate other motives. The regulation states that "[i]f the purpose to evade or avoid Federal in-

10. Four hypothetical fact patterns, stipulated to by the parties, demonstrate their dispute regarding the definition of "principal purpose." Each scenario assumes a tax purpose and two non-tax purposes. The relative importance of each purpose is represented by a percentage figure. While in the real world no such mathematical precision is possible (nor, indeed, is it necessary), the following examples illustrate the controversy.

### Scenario A

| Tax Avoidance Purpose | 60% |
|---|---|
| Non-Tax Purpose No. 1 | 20% |
| Non-Tax Purpose No. 2 | 20% |

The parties agree that in Scenario A, tax avoidance *is* the "principal purpose."

### Scenario B

| Tax Avoidance Purpose | 20% |
|---|---|
| Non-Tax Purpose No. 1 | 40% |
| Non-Tax Purpose No. 2 | 40% |

The parties agree that in Scenario B, tax avoidance is *not* the "principal purpose."

### Scenario C

| Tax Avoidance Purpose | 30% |
|---|---|
| Non-Tax Purpose No. 1 | 60% |
| Non-Tax Purpose No. 2 | 10% |

The parties agree that in Scenario C, tax avoidance is *not* the "principal purpose." Instead, Non-Tax Purpose No. 1 exceeds tax avoidance in importance and is the "principal purpose." However, a strict or literal interpretation of the regulation would require that Section 269 apply.

### Scenario D

| Tax Avoidance Purpose | 40% |
|---|---|
| Non-Tax Purpose No. 1 | 30% |
| Non-Tax Purpose No. 2 | 30% |

Here, the parties disagree. U.S. Shelter's contention is that tax avoidance (a 40 percent purpose) cannot be the "principal purpose" since the other two purposes, taken together (and totaling 60 percent), exceed it in importance. The Government contends that tax avoidance *is* the "principal purpose" because it is more important than any other purpose.

come tax exceeds in importance *any other purpose*, it is the principal purpose." Treas.Reg., Sec. 1.269–3(a) (emphasis added).

A comparison of the Senate Report and the House Report suggests that the Senate Report language was an attempt to liberalize the more restrictive language originally a part of the House Report. The Senate version of Section 269 was adopted and the Report accompanying it stated:

> The House bill made section 129 [*i.e.*, Section 269 of the current Code] operative if one of the principal purposes was tax avoidance. Your committee believes that the section should be operative only if the evasion or avoidance purpose outranks or *exceeds in importance, any other one purpose.*

S.Rep. No. 627, 78th Cong., 1st Sess. 59 (1943) (emphasis added).

The wording used in the Senate Report ("any other one purpose") is confusing and seems to suggest at first reading that a tax avoidance purpose must be compared to each separate non-tax avoidance (*e.g.*, business) purpose, and, if it exceeds in importance any one of these, then Section 269 applies. Such an interpretation, however, would call for ludicrous and illogical results not intended by the legislature. For instance, where one or more non-tax avoidance purpose(s) exceed(s) in value a tax avoidance purpose, a very minute, perhaps incidental, non-tax purpose, such as acquiring "goodwill," would require the application of Section 269.[11]

A more logical reading of the statute suggests treating tax avoidance purposes together as well as aggregating legitimate non-tax avoidance business purposes.[12]

The only Court to address this issue in depth adopted such an approach and rejected the approach suggested by a narrow reading of the Senate Report and regulations that each separate purpose must be tested against the tax avoidance purpose.

In *Bobsee Corp. v. United States*, the Fifth Circuit Court of Appeals explained:

> It seems clear that the Senate amendment was intended to increase the quantum of tax motivation necessary to bring a transaction within the prescription of the statute. However, as defined in the Senate report, the principal purpose could be a less significant motivation than that required by the House bill. For instance, if an acquirer has one very minute non-tax motive and a slightly more intense tax motive, then the standard articulated by the committee report would permit the application of section 269 even though the acquirer had other non-tax purposes greatly exceeding the tax purpose. Consequently, our *Green Light* decision heeded the policy and the actual language of the section rather than the abortive attempt at definition in the Senate committee report. *As we view the operation of the statute, there are only two relevant classes of purposes: tax-avoidance and non-tax-avoidance; the statute applies only if the former class exceeds the latter.*

*Bobsee Corp. v. United States*, 411 F.2d 231, 239 (5th Cir.1969).[13]

---

**11.** *See* Footnote 10, *Scenario C.* Even the Government rejects this interpretation as calling for the applicability of Section 269.

**12.** Several decisions, although not specifically addressing the aggregation/segregation issue, have found Section 269 inapplicable where the taxpayer's objectives, taken together, establish a more important purpose than the tax avoidance purpose. *See Louisville Store of Liberty, Ky., Inc. v. United States*, 179 Ct.Cl. 847, 855, 376 F.2d 314, 319 (1967); *Capri, Inc. v. Commissioner*, 65 T.C. 162, 179–80 (1975); *D'Arcy–MacManus & Masius, Inc. v. Commissioner*, 63 T.C. 440, 449 (1975); *Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. (CCH) 575, 585 (1983); *Thrifty Supply of Spokane, Inc. v. Commissioner*, 35

T.C.M. (CCH) 276, 281–83 (1976); *Fedcal Distributing Co. v. Commissioner*, 22 T.C.M. (CCH) 935, 940–41 (1963).

**13.** *See Green Light Co. v. United States*, 405 F.2d 1068, 1070, (5th Cir.1968) where, without analysis, the Court stated:

> For evasion or avoidance of Federal Income Taxes to be the 'principal purpose' of acquiring control of a corporation it must exceed all other purposes in importance. *Hawaiian Trust Co., v. United States* (9th Cir. 1961) 291 F.2d 761; 26 C.F.R. § 1269.3 at 625. The determination of principal purpose is one of fact, and requires a scrutiny of all circumstances in which the transaction or course of conduct occurred in connection with its tax

The Government does not make the extreme argument and agrees that the exceedingly narrow view was correctly rejected in *Bobsee*. Nevertheless, the Government takes exception with the *Bobsee* Court's conclusion that "there are only two relevant classes or purposes: tax avoidance and non-tax avoidance...." *Id.* at 239.

The Government argues that the *Bobsee* Court's opinion (1) substitutes a concept without statutory foundation ("classes of purposes") for the statutory language ("purposes"); (2) contradicts the explanation of the legislators who drafted the statute; and (3) invalidates a Treasury Regulation already approved by this Court in *Jupiter Corp. v. United States*, 2 Cl.Ct. 58, 65–66 (1983). The Government further argues that, aside from tax avoidance, U.S. Shelter had two distinct, even unrelated, purposes: (1) "going public," and (2) developing various business opportunities with FPC's businesses, assets and goodwill and claims that tax avoidance exceeded in importance not only each of those two purposes taken separately, but also both of them added together.

While the Government's position recognizes the flaw in a narrow reading of the regulation, its argument that tax motives should be measured against the two distinct purposes of "going public" and "developing business opportunities" is equally flawed. To segregate subclasses of business purposes for Section 269 application denies certainty in the law and offers confused direction for business planning.

The third sentence of the regulation provides "[t]he *determination of the purpose* for which an acquisition was made *requires a scrutiny of the entire circumstances in which the transaction or course of con-

*duct occurred,* in connection with the tax result claimed to arise therefrom." Treas. Reg. § 1.269–3(a)(2) (emphasis added). The word "purpose" is used in the singular, not the plural. It is logical that the circumstances of the transaction may encompass many smaller parts, or in the instant case, an aggregation of the several business components, which, taken together, form the business purpose.[14]

Such a reading "heed[s] the policy and actual language of the section rather than the abortive attempt at definition in the Senate committee report," *Bobsee Corp*, 411 F.2d at 239, or in the inconsistent regulation. *See Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). (Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.")

*A fortiori* U.S. Shelter had two purposes for the reorganization which must be compared to determine the applicability of Section 269: (1) the non-tax avoidance purpose of expanding its business through (a) the acquisition of FPC, which allowed U.S. Shelter to become a publicly traded company, and (b) the acquisition of the assets and businesses of FPC, and (2) the tax avoidance purpose of acquiring FPC's net operating loss carryover.

### B. Burden of Proof

The burden of proof in a tax refund suit is on the plaintiff. It is well established that the determination of the Commissioner (in this case, disallowing the net operating loss carryovers) is endowed with a presumption of correctness. *Jupiter Corp.,* 2 Cl.Ct. at 61; *Welch v. Helvering,* 290 U.S.

---

consequences. *Southland Corp. v. Campbell* (5th Cir.1966) 358 F.2d 333, 336–37; *Bonneville Locks Towing Co. v. United States* (9th Cir.1965) 343 F.2d 790, 791.

**14.** "Principal" is defined as "a matter or thing of primary importance". Websters Seventh New Collegiate Dictionary (1972). Black's Law Dictionary, 1073 (5th ed. 1986) defines "principal" as "chief; leading; most important or considerable; primary." To give any meaning to "principal" other than "primary" would be plainly inconsistent with the statute. *See Commissioner*

*v. Portland Cement,* 450 U.S. 156, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981). It should also be noted that the court in *Jupiter Corp.* did not have to reach the aggregation-segregation issue, but found that an examination of the entire circumstances surrounding plaintiff's acquisition preponderated in favor of a finding that "plaintiff's primary and dominant motive and intent in acquiring such control was for the principal purpose of tax avoidance." *Jupiter Corp.,* 2 Cl.Ct. at 66.

111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Montgomery Coca–Cola Bottling Co. v. United States,* 222 Ct.Cl. 356, 365, 615 F.2d 1318, 1322 (1980). To overcome this presumption, U.S. Shelter has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975). Thus, U.S. Shelter is required to show, by presenting substantial evidence, that non-tax business purposes predominated such that tax avoidance was not the "principal purpose" of the reorganization. If plaintiff fails to carry that burden, then the "principal purpose" for the reorganization must be considered to be tax avoidance and the Commissioner's initial determination, denying the refund, shall be upheld.

Once plaintiff has overcome the presumption which attaches to defendant's position, the determination of the "principal purpose" behind the reorganization of U.S. Shelter and First Piedmont Corporation in 1979 requires that the Court resolve a question of fact. *Jupiter Corp.,* 2 Cl.Ct. at 66; *R.P. Collins & Co. v. United States,* 303 F.2d 142, 145 (1st Cir.1962).

In cases involving Section 269, "careful consideration of the motive and intent of the top management officials of the acquiring company," is required. *Jupiter Corp.,* 2 Cl.Ct. at 66. Moreover, as Judge Lydon so accurately noted in *Jupiter Corp.,* "inferences, because of the amorphous nature of motive and intent, play a greater role in cases such as this and thus make the job of the trier of fact an extremely difficult one." *Id. See also D'Arcy–MacManus & Masius, Inc.,* 63 T.C. at 449.

■ After careful consideration of all of the evidence, as discussed below, it is determined that plaintiff has successfully carried its burden of overcoming the Commissioner's presumption of correctness by presenting substantial evidence that tax avoidance was not the principal purpose of the transaction.

Even though officers and directors may be interested parties, and their testimony alone is not sufficient to overcome the Commissioner's determination, their testimony cannot be disregarded unless it is contradicted, impeached, or inherently improbable. *See Wener v. Commissioner,* 242 F.2d 938, 944–45 (9th Cir.1957); *Chesapeake & Ohio Ry. v. Martin,* 283 U.S. 209, 216, 51 S.Ct. 453, 456, 75 L.Ed. 983 (1931).

Defendant cites *Jupiter Corp.,* 2 Cl.Ct. at 58, for the proposition that "even if deemed uncontradicted" such testimony is not sufficient to overcome the Commissioner's presumption of correctness. The opinion in *Jupiter Corp.* however, is not inconsistent with the analysis in the instant case, since, in the case before the Court, all of the circumstances are taken into consideration, including the testimony. *Jupiter Corp.* involved the issue of credibility, which does not stand for the proposition that testimony is unimportant. It stands for the proposition that testimony espousing a non-tax purpose will be carefully considered and will not be given credence where the objective facts so glaringly establish a tax avoidance purpose.

In this case, top management for plaintiff corporation all testified that Old Shelter's primary purpose for the reorganization was to become a publicly traded company, thereby obtaining SEC registered stock for its shareholders. This testimony was not impeached and is not inherently improbable since, that is actually what happened as a result of the reorganization.

Contemporaneous documents, such as the SEC submission, while lacking in precision and detail on the question of "going public," do not contradict, but instead, corroborate the testimony of the principals. The testimony of Lindsey and Pompan, who did not have a vested interest in the outcome of the litigation, and who were neither employees nor stockholders, further corroborates the testimony of the top management. *See D'Arcy–MacManus & Masius, Inc.,* 63 T.C. at 450 ("we also note, in weighing the testimony of Weir and Getz, that at the time of the hearing herein they were no longer employees of our stockholders in petitioner.")

The weight to be given oral testimony hinges on the trial court's evaluation of the credibility of the witnesses. Judging credibility, in turn, involves "an overall evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Wright and Miller, *Federal Practice and Procedure: Civil* § 2586 at 737 (1971). In this case, the reputation of the witnesses further tends to support the credibility of their testimony.[15]

A tax avoidance purpose is generally found to exist where the acquired corporation is a shell and no efforts are made to rehabilitate its business. While the testimony supports the proposition that FPC was struggling, the evidence in the record clearly contradicts a finding that FPC was a shell. As of June 30, 1979, FPC had total assets of $17,242,801, liabilities of $15,319,743 and a net worth of $1,837,934. New Shelter made substantial and continuing efforts after the reorganization to improve and expand the FPC businesses and to make them as profitable as possible, often at a loss. The existence of *bona fide* reasons to acquire the FPC business is not negated by the fact that the anticipated results did not occur. On the contrary, the business related reasons given for the acquisition, substantiated by testimony, documents, and evidence of business expansion efforts, are substantial enough to rebut the presumption of the Commissioner's correctness.

In reaching his determination, the Commissioner "did not have the benefit of a trial record on which to predicate his conclusion—a record which serves to rebut the presumption that would otherwise carry the day for him." *Jupiter Corp.*, 2 Cl.Ct. at 76.

The presumption of correctness, having been overcome, disappears from the case, and the Court is now required to base its decision on the preponderance of the evidence. *KFOX*, 206 Ct.Cl. at 144, 510 F.2d at 1369.

Two questions the Court must address are (1) whether Old Shelter had a policy of acquiring companies with tax losses, and (2) whether the existence of such a policy is sufficient evidence to establish that the "principal purpose" of the Shelter/FPC reorganization was tax avoidance. The Government argues affirmatively in both cases.

The relevant date for determining the "purpose" is the date of the reorganization, November 16, 1979. *Jupiter Corp.*, 2 Cl.Ct. at 63. Necessarily, prior, contemporaneous, and subsequent actions and statements of the plaintiff and others involved in the transaction shed light on the intent and motive.

### C. Factors Considered in Establishing Principal Purpose Motivation

1. Was there a policy of tax avoidance?

a. Was Old Shelter or FPC predisposed to tax avoidance practices?

As of November 16, 1979, Old Shelter had a history of aggressive expansion and had already acquired eight other companies. One, Horizon Apartments, Ltd., had a net operating loss. Horizon constructed buildings that Old Shelter syndicated, and both companies were essentially owned by the same persons. The merger was undertaken to bring the two companies under one roof, according to Tuck, and to "put Shelter in the development business and in the construction business in a fairly strong way." The Court is not convinced that one loss acquisition out of eight acquisitions reflects a policy of acquiring loss corporations. Furthermore, no evidence in

---

**15.** *See* section II of the opinion, entitled "WITNESSES", *supra.* The best argument the Government makes to challenge witness credibility is that the intervening time between the reorganization in 1979 and trial in 1987 makes it more difficult to remember and understand what one's own motives were at the earlier time. The Government goes so far as to argue that the integrity of the witnesses need not be at issue in deciding the credibility of their testimony and suggests the Court may ascribe significance to the respect they enjoy in the community and still find their testimony to be incorrect. While the precision of some testimony by plaintiff's witnesses was obviously dulled by the time lapse, nevertheless, it was rational, internally consistent, and hung together with the other evidence to build a believable story.

the record supports an assertion that the Horizon merger was undertaken for other than business reasons.

Defendant relies heavily upon a corporate resume prepared by Tuck in 1978. It stated:

> It has been our policy to try and acquire real estate management companies that had good personnel and also had possible tax loss carryforward due to the fact that they had retained equities in their company.

The Government argues that this document establishes that Old Shelter had a policy of acquiring tax benefits since the document was intended for distribution to corporate financial houses on Wall Street to introduce them to U.S. Shelter and to point out that U.S. Shelter was looking to buy companies with tax loss carryovers.

Plaintiff contends that Tuck's statement was internally inconsistent and does not make sense as written. Plaintiff urges that a fair interpretation would be Tuck's testimony on the point at trial that if a company met his acquisition criteria and also had a tax loss, that would be an added advantage.

A formally documented policy of expansion or diversification through acquisition rather than through internal growth tends to establish a non-tax avoidance motive. Neither Old Shelter nor FPC had such a formally documented policy. However, in *D'Arcy–MacManus & Masius, Inc.*, the fact that the acquisition at issue was "only one of many" in which the acquiring corporation was involved, was found to support the taxpayer's contention of a business purpose as the principal purpose of the transaction. *D'Arcy–MacManus & Masius, Inc.*, 63 T.C. at 450.

The fact that there was only one loss acquisition out of eight, weighs against defendant's argument that Shelter had a policy of acquiring loss corporations. Further, FPC was not a real estate management company; if it had been, perhaps a different conclusion could be drawn.

b. Did U.S. Shelter's and FPC's contemporaneous statements and actions show Old Shelter's dominant interest to be the use of FPC's tax benefits?

When the reorganization was first considered, all the parties were aware of FPC's tax benefits. Likewise, they all knew that, unless FPC was acquired by a company with sufficient earnings, it was unlikely that FPC would be able to take full advantage of the NOLs and that they would expire. Old Shelter did, in fact, expect earnings sufficient to utilize the NOLs incurred by FPC and Old Shelter's officers knew that if the combined company was profitable, then the NOLs had value in that they could offset taxes. Wyche, an Old Shelter director, testified that NOLs "have value in the sense that if the company makes a profit and if the NOL is available then that profit is butted against the loss of the company earlier sustained." However, Wyche also testified that the NOLs "were an insignificant factor in the First Piedmont deal." Tuck testified that he had heard "Wall Street people try and evaluate what NOLs are worth to a company." Although it is not disputed that the FPC and Old Shelter personnel involved knew that the NOLs would survive the reorganization, Tuck testified that Old Shelter did not pay anything for those tax benefits in negotiating with First Piedmont, but rather "bought First Piedmont on its book value."

While all the FPC and Old Shelter directors who testified denied that tax avoidance was a major reason for the reorganization, it is clear that they were aware of the NOLs and desired to use them if possible. Tuck stated that he would have entered into the First Piedmont reorganization even if the NOLs were not available, but added:

> [T]here's no question that the NOLs, that if we could use them, were a very important portion of this thing.... I make no bones about it, we wanted this transaction. We told the lawyers to try and structure the transaction where we could use those tax credits. I'm paid as a CEO of a company to look out for its assets. We work in an industry that is tax shelter driven by Congress. They dictated it,

we didn't dictate it. We're simply trying to structure things to where they benefit our limited partners....

Such motive or intent is not fatal. It is not inconsistent with the cases which hold Section 269 inapplicable. The principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences. As one Court has stated, "[c]omplicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or other tax benefits] to be nothing more than prudent business planning." *VGS Corp. v. Commissioner*, 68 T.C. 563, 596 (1977).

In *Arwood Corp. v. Commissioner*, 30 T.C.M. (CCH) 6, 22–23 (1971), the Tax Court stated:

> We do not believe that, whenever the method chosen in a given case to effect an acquisition is one which assures favorable tax results, we must necessarily conclude that the principal purpose of the transaction is tax avoidance. The merger in the instant case was designed to permit the deduction of the carryovers, in the event that such deduction would prove to be permissible. We think that arranging the merger in a manner that produces the most favorable tax results is simply intelligent business planning. It must be remembered that section 269 addresses itself to a situation where the principal purpose of the acquisition is tax avoidance; in the present case only the method selected for effecting the acquisition was motivated to some extent by tax considerations.

*See also Stange*, 36 T.C.M. (CCH) at 39; *D'Arcy–MacManus & Masius, Inc.*, 63 T.C. at 451.

One Judge has said that "[i]n the complexity of today's business and tax jungle, a corporate president who does not obtain tax advice before an acquisition, or merger or substantial dollar transaction ought to be fired." *Brumley–Donaldson Co. v. Commissioner*, 443 F.2d 501, 510 (9th Cir. 1971) (Trask, J., dissenting).

A review of contemporaneous documents and statements helps to ascertain whether tax avoidance was the principal purpose of a transaction.

Defendant points to several other documents and statements to support its argument that tax avoidance was the principal purpose of the U.S. Shelter/FPC reorganization. It cites a July 23, 1979, memorandum from Orders to the FPC Board of Directors regarding the acquisition/merger with U.S. Shelter. The memorandum, in discussing the aspects of the merger, contained several references to First Piedmont's NOLs and their benefits to the reorganization. Included among them are the following:

> \* \* \* \* \* \*

> The First Piedmont operating loss and investment tax credit carryforwards combined can shelter earnings of $3.4 million with only a minimum tax of about $200,-000. Based on ... the projections of future earnings of the new company, it appears that that tax shelter of First Piedmont can be fully utilized....

> ...[I]t appears that the new company should earn about 45¢ to 55¢ per share in 1980 and 1981, after benefitting from the tax shelter afforded by First Piedmont.... After the loss carry forward is entirely used up, earning per share after taxes of the new company in 1982 should still be in the range of 50¢ per share....

> \* \* \* \* \* \*

> ...[T]he formation of the new company appears to insure the utilization of the tax benefits presently held by First Piedmont, something that is definitely beyond the reach of First Piedmont alone....

> \* \* \* \* \* \*

In analyzing these references, weight must be given to the testimony of Page, the principal author of the document. Page testified that references to the NOLs were necessary because the directors of FPC analyzed the proposal on the basis of the "bottom line" effect on earnings per share and that these earnings would be affected by the NOLs. Therefore, their inclusion was necessary.

Further, the memorandum discussed many of the business advantages which would result from the reorganization. Included among them were the following:

\* \* \* \* \* \*

... The addition of Equipment Leasing Corporation and Computer Resources to these basic USSC operations will result in an attractive new holding company initially operating six distinct business activities....

\* \* \* \* \* \*

... For First Piedmont Leasing it is expected that substantial additional credit lines will be made available through the new company at interest rates lower than are presently available to First Piedmont Leasing. It is also felt that opportunities for business for the leasing company will be created by the new company....

For Computer Resources the addition of the USSC apartment management business alone will increase revenues by 40%, a substantial part of which should go to the bottom line. Also, it is expected that additional opportunities for new business will arise through the new company.

As a further aid to the earnings of First Piedmont's part of the new operation, it is expected that certain properties from First Piedmont Mortgage's portfolio would be syndicated in order to stop the carrying costs, and that certain other properties would be developed. The new company will also be more able to hold for future sale those properties that have a potential of increased value and profit by being held for a while.

\* \* \* \* \* \*

It appears that the earnings potential of the new company should result in a market for the stock of the new company at a price substantially in excess of that that could be reached through the efforts and the earnings of First Piedmont Corporation alone.

\* \* \* \* \* \*

Attached to the July 23, 1979, memorandum was a chart entitled "Outlook" which presented the projected performance of the reorganized company. The effect of FPC's NOLs was reflected in the projections given for estimated taxes which show no tax liability for 1979 or 1980. However, the "Outlook" chart projected the estimated taxes, net earnings and earnings per share for 1979 and 1980 as well as for 1981, when the NOLs would no longer be available. Page testified that the projections were made because:

[T]he use of the tax loss carryforward was a short term benefit from our perspective and we wanted to make sure that we went through the exercise to the extent that people would recognize that there would come a time when that benefit was no longer there, and ... we did not want to have anybody make judgments based on a short term benefit ... arising from the existence of the tax loss carryforward if it didn't also show benefits once that benefit [NOLs] had been used.

The prospectus and proxy statement dated October 25, 1979, issued by First Piedmont describing the proposed transaction, mentioned and discussed the NOLs as well as the business reasons for the reorganization. In the section entitled "SUMMARY OF PROXY STATEMENT" and the subsection entitled "Reasons for the Asset Acquisition" it stated:

It is the opinion of the FPC Board that the acquisition will provide FPC with an opportunity for additional earnings, access to additional sources of capital and an opportunity to utilize FPC's available tax credits.

The proxy statement section entitled "GENERAL DESCRIPTION OF PLAN" and the subsection entitled "Reasons for the Asset Acquisition" stated:

The Board of Directors of FPC, after extensive consideration and study, has concluded that the consummation of the proposed exchange with Shelter upon the terms contemplated by the Plan is fair and equitable and to the benefit of FPC's shareholders. While FPC's data processing and leasing operations are presently profitable, the continued significant costs

of carrying its mortgage portfolio and related properties has in the past and continues to offset such profit.

The acquisition of the Shelter operations will provide FPC with the opportunity for additional earnings from the acquired businesses which complement its present activities, will make available to it additional credit with which to expand its equipment leasing business and, in general, will provide it with access to additional sources of capital and management. The real property owned by FPC's mortgage subsidiary will compliment and allow expansion of the real estate development business to be acquired from Shelter. FPC's computer service bureau will be able to provide computer service to the businesses to be acquired as well as to some or all the businesses retained by Shelter. Finally, after the transaction, the shareholders of both companies will have stock interests in a larger company which will provide a better vehicle for growth, as a diversified financial and real estate operations company, and the Shelter shareholders will own shares of a publicly traded stock.

As a result of earlier losses suffered by it, FPC has tax credits and losses which would allow it to shelter in excess of $3 million in pre-tax earnings. However, the timing of the expiration of such credits and losses under applicable tax law makes it unlikely that FPC as presently constituted will be able to take full advantage of these credits and losses. It is anticipated by management that the earnings of the combined operations of FPC and the businesses being transferred from Shelter will be sufficient to take advantage of these credits and losses.

The subsection entitled "Basis for Exchange" contained the following statement:

... The ensuing negotiations were conducted at arms length by N. Barton Tuck, Jr., President of Shelter and by Walter Clark, President and William N. Page, Vice President and Treasurer of FPC. These discussions culminated in the Boards of Directors of FPC and Shelter unanimously approving the agreement between FPC and Shelter on July 26, 1979. The agreed exchange ratio took into account the relative current and potential earnings levels of the businesses to be combined, the values of the net assets being combined on both an historical cost and appraised value basis, the tax-loss carry-forward of FPC, and the increased financial strength which would accrue to FPC's benefit from the combination.

\*   \*   \*   \*   \*   \*

The NOLs were discussed with the shareholders of FPC and the reorganized company, New Shelter, on two subsequent occasions. At the November 16, 1979, FPC shareholders meeting, at which the reorganization was approved, FPC's Chairman, Orders, described the proposed reorganization. The minutes of the meeting report his comments as follows:

... Mr. Orders described First Piedmont's past history and current condition including the existence of a substantial tax loss carryforward which it appeared unlikely to use itself. This tax benefit as well as its publicly traded stock made the combination with another company a logical consideration.

\*   \*   \*   \*   \*   \*

And, in its 1979 Annual Report (published in March 1980), U.S. Shelter discussed the reorganization in a letter from Mickel and Tuck to the shareholders. It stated in part:

\*   \*   \*   \*   \*   \*

However, of most importance in the review of the past year is an understanding of the significance of the merger with First Piedmont Corporation, which was concluded in November. Substantial corporate energy was expended over a good many months in order to bring that combination to completion. Perhaps that diluted some efforts that might have been devoted to pursuing growth opportunities in other operating divisions. Nevertheless, it is our clear feeling that the investment in that project will provide an important long-term return. We gained two fine operat-

ing divisions, an important stockholder base, and substantial tax-loss carryforwards. We significantly improved our equity base, which should allow us to protect future earnings with less dependence on additional debt. Perhaps most important of all, we became a publicly traded, SEC registered corporation.

\* \* \* \* \* \*

Available tax credits and loss carryforwards will allow us to shelter approximately $3 million in future earnings. We expect to realize that benefit in a relatively short period of time. Therefore, in order to better preserve the comparability of year-to-year net income, we will show the benefit from reduced taxes as an increase in shareholders' equity. The earnings statement will show applicable taxes without including the benefit arising from the use of these tax benefits.

\* \* \* \* \* \*

While availability of the NOLs was a part of the merchandising technique used by FPC, the testimony and contemporaneous documents make clear that FPC's dominant purpose was to combine its operations with a company that would (1) allow FPC to survive as a business or component of another business, (2) increase the value of the shareholder's stock, and (3) provide access to additional sources of capital. The record reflects that these objectives were, in fact, accomplished with the reorganization. FPC's prior use of capital infused into its operations in 1976 by individuals with a significant shareholder base in Old Shelter was compatible with this objective.

Acquisition of FPC by Old Shelter was also compatible with Old Shelter's objective of business development and growth. The record reflects that this objective was also accomplished with the reorganization.

### c. Subsequent transactions

At trial, defendant introduced evidence regarding a 1981 New Shelter transaction with American Fletcher Mortgage Investors (AFMI) involving net operating loss carryovers. Plaintiff objected to this testi-

mony on the ground that the AFMI transaction, which occurred in December 1981, was not probative of Old Shelter's motive or intent in 1979. The Court, however, allowed the testimony because of the size of the AFMI net operating loss carryover, and evaluated the transaction in view of the underlying argument by the Government that Old Shelter was predisposed to tax motivated transactions.

The December, 1981 Shelter/AFMI transaction involved approximately $25,-000,000 in NOLs. Although this matter is not before the Court, the Government claims that the transaction included *indicia* that federal income tax consequences were an important aspect of the deal. In support of this proposition, the Government cites the testimony of Wyche, who stated that the NOLs were a factor in the transaction, and the testimony of Page, who testified that Shelter sought to determine whether AFMI's NOLs would be available to the new company. Further, the Government notes that AFMI's NOLs were discussed in SEC rulings describing the transaction, and claims that prior to the approval of the AFMI transaction, Tuck sent a letter to the Board of Directors with the intended effect of making the transactions appear non-tax motivated. The letter reads in pertinent part:

Gentlemen: ...

As the minutes reflect I believe this is a major opportunity for all the U.S. Shelter shareholders.

AFMI does have a substantial tax loss carry-forward. Without this net operating loss, the opportunity presented is, nevertheless, worthwhile. If we can utilize the net operating loss, it will make the deal that much better, but in deciding on proceeding you should ignore the tax loss and consider that as "gravy" that may or may not be realized.

\* \* \* \* \* \*

The Government claims the letter was self-serving and had the opposite effect, in that it was drafted and circulated to obfuscate the principal purpose of tax avoidance.[16]

---

**16.** No such letter was drafted and circulated at the time of the Old Shelter/FPC reorganization.

Even though New Shelter's attorneys could not assure that the IRS would not prevail on the issue, the directors of New Shelter, who were involved in the Old Shelter/FPC transaction, approved the transaction.

In the years following the FPC reorganization, New Shelter was involved in twenty-three other acquisitions. Three of those involved loss corporations. In two of the three, the acquisitions were made even though the losses could not be utilized because of the consolidated return rules. Acquiring companies with losses that cannot be utilized does not justify an inference of a tax avoidance motive. If anything, those acquisitions evidence business considerations as being more important than tax considerations in the implementation of plaintiff's acquisition policy.

Overall, an objective review of the acquisitions by Old Shelter and by New Shelter does not establish that it had a policy of acquiring loss companies principally for tax avoidance purposes, but instead exhibits an aggressive acquisition policy of business growth.

2. Was "going public" a significant purpose for Old Shelter's acquisition?

■ Plaintiff contends that going public was *the* principal purpose, that this purpose was enunciated in contemporaneous statements, and that any absence of such was purely because the purpose and effect of the reorganization was clear on its face. Clark testified that when he approached Tuck regarding the proposal "the strongest point I tried to make initially was the opportunity of U.S. Shelter to go public because I knew that they had a closely held situation and it [is] always difficult to realize the values out of that sort of thing."

The Government argues that the lack of contemporaneous statements regarding Old Shelter's desire to "go public" indicates that this was not the principal purpose of the acquisition.

The Government argues that there was a lack of documentation in regard to the Old Shelter/FPC transaction. Such an argument

The Government cites a news release dated July 26, 1979, in which FPC announced the proposed reorganization. This document contained comments of Old Shelter's president, Tuck. Nowhere in this document was emphasis focused on the fact that the new organization would be a publicly traded company. However, plaintiff convincingly points out that this was unnecessary because the document was directed to the shareholders of FPC who already held publicly traded stock and would continue to do so. Plaintiff also argues that the Reorganization Agreement contained two conditions: (1) approval of the transaction by the directors and shareholders of FPC and Old Shelter, and (2) a favorable ruling from the IRS regarding the tax-free distribution of stock to its shareholders. This confirms the unanimous and uncontradicted testimony of all witnesses at trial that the distribution of the FPC stock to the Old Shelter shareholders on a tax-free basis was the most critical aspect of the agreement and all that was needed to be emphasized in the announcement.

The Government also cites a draft proxy statement, prepared by Old Shelter's attorneys and reviewed by its officers, which did not mention the publicly traded nature of the proposed New Shelter stock. Nor did a revised draft circulated among FPC and Old Shelter personnel. Only at the request of the SEC did the final proxy statement mention that public ownership was a reason for the acquisition. However, Shoemaker, the attorney who prepared the proxy statement, testified that it would have been "totally redundant" to state in the prospectus that the Old Shelter shareholders were going to receive publicly traded stock.

The Form S–14 Registration Statement outlining the reorganization, which was required to be filed under the Securities Act of 1933 and 17 C.F.R. § 230.145 (1985), stated on the cover page:

\* \* \* \* \* \*

highlights the Hobson's Choice faced by the taxpayer if it overreacts in an effort to document or downplay the tax avoidance aspect.

Approximate date of commencement of public offering: As soon as practicable after the respective date of the Registration Statement.

\* \* \* \* \* \*

This language clearly indicates that the stock would be publicly traded.

In addition, the Government argues that the June 18, 1979, ruling request prepared by Ernst & Whinney (concerning the Federal income tax consequences of the proposed transaction) did not mention public status in its section entitled "Business Reason for the Proposed Reorganization." However, in the immediately preceding section entitled "Background of Proposed Transaction," it was stated:

The essence of the proposed transaction is the transfer of business assets by U.S. Shelter Corporation to First Piedmont Corporation in exchange for its voting common stock representing control, followed by the pro rata distribution of such stock to the shareholders of U.S. Shelter corporation.

In Appendix A, § 3.04 of the ruling request, entitled "Business purpose," the following language appeared:

\* \* \* \* \* \*

... Further, after the proposed transaction, the shareholders of both companies will have stock interests in a larger company which can better provide a vehicle for growth as a publicly traded diversified financial services corporation.

Finally, the Government argues that when the IRS specifically inquired about the business purpose for Old Shelter's distribution of 80 percent of the FPC stock to the Old Shelter shareholders, plaintiff did not state that the purpose was to give the Old Shelter shareholders publicly traded stock. Rather, the explanation was that "the management and shareholders of First Piedmont find it unacceptable to be a subsidiary of U.S. Shelter in that such a relationship would create significant problems to First Piedmont...." The plaintiff argues that the emphasis in the July 19, 1979, supplemental submission to the IRS concerning the reason FPC wanted stock distributed to Old Shelter shareholders was to satisfy a technical requirement of the code section involved at the request of the IRS specialist handling the ruling request. Pompan, the draftsman of both the ruling request and supplemental submission, stated that it was his understanding that the IRS was interested in FPC's business purposes, not the business purpose of Old Shelter.

Aside from the argument that there was a paucity of contemporaneous statements supporting Old Shelter's desire to "go public," the Government argues that Old Shelter never investigated other means of going public in 1979 or before; that whatever its advantages, being a public company has substantial disadvantages, which New Shelter has had to contend with since the reorganization, including stockholder suits; and, that the benefits of being publicly traded depend on there being a market for the stock, but FPC's shares experienced only limited trading before the reorganization and the stock issued after the reorganization has not experienced a significant increase in trading volume. In response, plaintiff, through the testimony of Tuck, Wyche and Mickel, answered that Old Shelter could not have gone public through a traditional underwriting in 1979, and that the reorganization offered Old Shelter a unique opportunity to go public. Further, despite any disadvantages which may be associated with being a public company, plaintiff stated that going public was, on the whole, enormously advantageous for Old Shelter and its shareholders, as the market reacted favorably to the reorganization.

Although New Shelter's stock was relatively illiquid as compared to the average stock listed on a national security exchange, it was, nonetheless, publicly traded stock, whereas the stock of Old Shelter was absolutely illiquid, nontraded and nontradable. Aside from the major shareholders of Old Shelter, 5 to 10 percent of the company's stock had been sold to employees. However, this stock was restricted by an Employee Stock Purchase Agreement which (1) permitted U.S. Shelter to repurchase the stock within 90 days of the em-

ployee's death or termination of employment, and (2) prohibited the employee from selling, assigning, pledging or in any way encumbering the stock without the written consent of U.S. Shelter.

Tuck testified convincingly that the phenomenal growth of New Shelter would not have been feasible if the reorganization had not taken place in 1979. Old Shelter was formed in 1972 with nominal capital. At the time of the reorganization Old Shelter had annual revenue of approximately $6 million and assets of approximately $6 million. By 1984, it was a publicly traded company with annual revenue of $67 million and assets of over $200 million.

Uncontroverted testimony at trial substantiated the proposition that "going public" was the primary purpose of the transaction. While contemporaneous documentation did not emphasize such a motive, neither did it contradict it. The Government calls upon the Court to draw an inference from the lack of documentation on "going public" that it was less important than the tax aspects. The Government has not met its burden. Plaintiff's reasons for not emphasizing "going public" as a basis for the transaction in its communications with the FPC stockholders were not illogical; they already owned stock in a public company and going public only affected the stockholders of Old Shelter. Its argument that the SEC filing, on its face, reflected that "going public" was a primary motive is reasonable, especially given the fact that New Shelter became a publicly traded company.

Plaintiff's evidence does not warrant an inference that "going public" was *the* principal purpose outweighing the aggregate of all other purposes. Nevertheless, it must be considered an integral part of the transaction. Considered as a whole, plaintiff's explanations, with no contradictory testimony, together with the uniqueness of the opportunity to go public, are sufficient for a finding that going public was a significant purpose of the transaction and far outweighed the tax considerations.

3. Was obtaining FPC's assets a significant purpose for Old Shelter's acquisition?

a. Was FPC a failing company and did Old Shelter believe that it was a failing company?

FPC began as a bank holding company, consisting of a bank and seven other subsidiaries. Three of the subsidiaries either never became active or were discontinued promptly thereafter. Three other businesses were discontinued after several years: the travel agency was sold in 1976; the mortgage business was sold in 1977; and, the bank, which was FPC's principal asset, was sold in March, 1977. The sale of those FPC assets, in addition to the sale of subordinated debentures in the amount of $2,760,000, provided FPC with sufficient working capital to meet its immediate obligations. Thus, after the sale of the bank assets in 1977, and until the 1979 reorganization, FPC consisted of Equipment Leasing, Computer Resources, and the mortgage portfolio which FPC was trying to liquidate. FPC focused its efforts on these businesses with the goal of stabilizing the financial condition of the corporation.

Although Equipment Leasing's lease portfolio had diminished each year after 1974, as had its gross revenues, and although it had not generated the level of activity which the FPC management had anticipated by 1979, it had reduced its non-earning assets and had reestablished credit lines, bringing the company back into profitable operation with the opportunity for better earnings. This is documented in a December 8, 1978 Situation Report from Clark to Orders. Although Equipment Leasing did not realize the income projections made after the reorganization, it was a successful business for New Shelter. Its volume of business increased, it was sold for $1.8 million, and it is still a successful business as a subsidiary of American Federal Bank.

Computer Resources experienced some serious operating difficulties following the installation of new equipment and the shift to new on-line service, which put it approximately six months behind schedule regard-

ing new business and earnings. Nevertheless, it became the largest service bureau in the market area in terms of sales volume, with the opportunity for substantial earnings in the immediate future.

The real estate and loan portfolio of First Piedmont Mortgage was the source of most of FPC's financial problems, and had, in the years 1976 through 1978, generated $5,000,000 in losses. By late 1978, the real estate had been written down by $2,000,000 and had an aggregate book value of $9.6 million, which plaintiff believed to be a source of substantial potential value.

In summary, there is substantial evidence to support a finding that FPC had significant financial problems, but there is little evidence to support a finding that FPC was a failing company or that Old Shelter believed it to be so.

b. Did Old Shelter have a substantial interest in Equipment Leasing?

(1) Equipment Leasing's existing "net lease" business

Plaintiff contends that Old Shelter wanted to acquire Equipment Leasing so that it could (1) expand the existing "net lease" business of Equipment Leasing, and (2) commence the syndication of equipment leases as a new line of business. Tuck, Old Shelter's president, expected the "net lease" business to yield a profit of approximately $100,000 to $200,000 a year, which he considered "minimal" yet important to the company. Wyche, an Old Shelter shareholder, director and secretary, thought Equipment Leasing's "full payout lease" approach reflected an overly conservative "banker mentality," and did not consider it to be a real leasing activity. Rather, he believed that a "general leasing company could have been much more aggressive." He recognized, however, that the leasing business was a good, profitable operation.

Plaintiff's stated purpose of the reorganization with regard to Equipment Leasing's existing business was that Old Shelter would be able to "make available to it additional lines of credit with which to expand its equipment leasing business...."

In fact, New Shelter did obtain and guarantee millions of dollars of credit for the benefit of Equipment Leasing after the reorganization, and, as obligor, made sales of commercial paper to the public in order to provide Equipment Leasing with additional credit for expansion. Despite these monetary commitments and the fact that Equipment Leasing's volume of business and profits increased, the Government argues that providing credit to expand the net lease business was not a purpose of Old Shelter with regard to the reorganization. In support of this argument, the Government states that the management of FPC and New Shelter were not very definitive about the amount of credit that New Shelter would obtain for Equipment Leasing and eventually considered Equipment Leasing to be a drain on its capital because of its heavy borrowing, which was in direct competition with New Shelter's other businesses. When New Shelter sold Equipment Leasing in June 1983, it explained to its shareholders that "the equipment leasing business simply did not mesh with the operations of the company's major divisions and its capital-intensive nature was not appropriate for Shelter's primary business objectives." Further, when New Shelter decided to sell Equipment Leasing, its net lease business was projected to make profits of $200,000, $300,000 and $400,000 for 1983, 1984, and 1985, respectively, and it had the potential for more business but it was forced to turn customers away for lack of credit.

(2) Syndication of equipment leases

Another of Old Shelter's purported reasons for the reorganization was its interest in syndicating equipment leases through Equipment Leasing Corporation. The Government argues that syndication of equipment leases was not important to Old Shelter based upon the fact that Old Shelter's accountant, Pompan, who interviewed the personnel and drafted the ruling request, did not recall discussing the possibility of syndicating equipment leases. Furthermore, no formal discussions or business plans regarding the syndication of

equipment leases ever took place; instead, syndication was just a concept which was brought up during general conversations. The idea of syndicating equipment leases was never set forth in writing in any form until the minutes of a meeting of New Shelter's directors, held February 16, 1981, in which the idea was described as a "new venture." In addition, equipment lease syndication was not discussed in the proxy statements submitted to the SEC despite the SEC's general request for a description of "the combined company as it will exist after the transaction," and its more specific request that "new ventures" be described. Finally, the Government argues that the one New Shelter employee assigned to attempt an equipment lease syndication was left to grasp the information by himself without any direct involvement by, or "any assistance from," the syndication division of U.S. Shelter. The employee never obtained the necessary registration with the National Association of Securities Dealers and never accomplished a single syndication despite the fact that one was developed but was rejected by the client. Plaintiff is unable to rebut the Government's arguments. The Government is persuasive on this point.

### c. Did Old Shelter have a substantial interest in Computer Resources?

Plaintiff contends that it had three primary reasons for wanting to acquire Computer Resources: (1) to expand and improve Computer Resources' existing service bureau business; (2) to use Computer Resources to provide in-house computer support to New Shelter; and (3) to develop, use and market new property management software. The Government contends that the facts refute all three of these assertions.

### (1) Computer Resources' existing service bureau business

The Government points to several factors which it claims indicate that Computer Resources' existing service bureau business was not a reason for plaintiff's acquisition. It argues that Old Shelter's personnel did not perform any investigations or give any serious study to determine the desirability of getting into the service bureau business or to determine the practicality of operating such a business as part of U.S. Shelter. Further, the Government points out that Tuck's profit expectations for Computer Resources was nominal and only in the $100,000 to $200,000 range annually. The Government asserts that Computer Resources' performance was a financial disappointment. This is reflected in the annual reports which show losses or declining revenues for the service bureau business. Finally, the Government points out that in 1983, New Shelter decided to sell the service bureau business at a loss of $205,000 despite the fact that New Shelter projected the business to make profits of $200,000 to $400,000 in 1984 and 1985.

In response, plaintiff states that although the initial profit expectations for Computer Resources were nominal, they were based on the fact that it was a purely local operation. Tuck, however, stated that he wanted the business to grow both as a data processing bureau and as a marketer of software business. Plaintiff also contends that despite the fact that no studies were performed, U.S. Shelter was itself a major user of data processing services and the principals knew from their own experience that the business had possibilities. Most importantly, plaintiff argues that although Computer Resources' financial results were disappointing, this was not due to lack of effort on the part of New Shelter, which devoted large amounts of money to Computer Resources and to its service bureau business. Computer Resources' operations in handling the in-house data processing of New Shelter and developing a management information system for New Shelter were successful and they continue today.

Page explained that the decision to sell the service bureau business was twofold. First, New Shelter was concerned about technical changes in the industry such as the advent of smaller, cheaper computers; second, they realized the value of Computer Resources to Shelter's own operations

and wanted to concentrate its effort in that area.

### (2) In-house computer service

The Government states that the facts indicate that Old Shelter did not want Computer Resources to perform its data processing and did not in fact use Computer Resources to perform its data processing. Old Shelter had used Computer Resources for data processing beginning in 1972, but dropped it several years later and retained another local firm, Computerecords, in its place because Old Shelter had had "very negative experiences with Computer Resources." In 1978, before the reorganization was contemplated, Computer Resources had solicited Old Shelter's business again. However, Old Shelter turned it down because Old Shelter had decided to perform its data processing needs in-house.

Prior to the reorganization, Old Shelter had contemplated purchasing Computerecords, which was owned by Raymond D. Finch, a friend and business associate of Tuck. Not satisfied with the leadership of Computer Resources, Old Shelter arranged for the purchase of Computerecords to take place in conjunction with the reorganization. In addition, from Old Shelter's point of view, going through with the reorganization hinged on a change in leadership at Computer Resources. Both FPC and Old Shelter agreed that Computer Resources' president needed to be replaced; consequently, Computer Resources hired a new president who was interviewed and selected by Old Shelter management before the reorganization actually took place. Further, the Government argues that despite Old Shelter's supposed policy of acquiring good personnel, Shelter performed a complete turnover in Computer Resources' personnel along with a replacement of its equipment. As of July 1979, Computer Resources had twenty-three employees. Of those twenty-three, only six remained as of December, 1980. At that time, thirty-six of the company's forty-two employees had been brought in after the decision to reorganize. Thus, the Government argues that Old Shelter was interested in acquiring and using Computerecords instead of Computer Resources for its data processing.

Plaintiff responds by stating that it had a policy of hiring competent personnel and followed this policy by hiring Reynolds to replace the former head of Computer Resources. Tuck testified that Reynolds "came here to try and really fire that business up and get it going somewhere," which created uncertain feelings among some of the personnel. However, Gossett, the present director of Shelter's data processing division, was an employee of Computer Resources prior to the reorganization, and 23 of Computerecords' 54 employees at the end of 1979 had been employed prior to July 1979.

### (3) New software

Finally, the Government argues that the facts show that Old Shelter did not have any significant interest at the time of the reorganization in using Computer Resources to develop, use and market new property management software. With regard to developing the software, the Government argues that plaintiff did not consider it an important interest at the time of the reorganization because software was not mentioned in the ruling request or the proxy statement. In addition, it was not until October 1980, nearly 15 months after the decision to acquire FPC, that New Shelter organized an internal committee to develop the new system; and, it was not until May 1981 that employees of Computer Resources started developing the software which became functional in late 1982. Yet, all testimony at trial directly confirmed that Old Shelter's principals did anticipate that Computer Resources would be used to develop and market such software. Although this was not specifically set forth in the ruling request and the proxy statement (because they are not intended to be detailed business plans), the following statement did appear in both the ruling request and the proxy statement: "Computer Resources, Inc. will be able to provide computer services to the businesses to be acquired ..." Although it took approximately one year before a committee was orga-

nized to develop a new system, Reynolds, the president of Computer Resources, stated that his initial duties were devoted to converting Shelter's work from Computerecords to Computer Resources and making personnel changes. Once the Management Information System project was undertaken, massive amounts of time and effort were devoted to it and it subsequently became a reality.

With regard to marketing the software, the Government argues that this was such a remote idea in 1979, and so feeble an effort when finally undertaken, that it can in no way be considered a purpose for the reorganization. To support this the Government states that (1) no serious discussions were undertaken regarding marketing of the software, (2) it was not mentioned in the ruling request or the proxy statement, (3) consultants were never hired to assist in marketing the software, and (4) money was never spent for advertising. In addition, no timetable for marketing the software, no marketing plan, and no advertising budget was discussed in 1979. Further, no discussions or serious efforts were made in 1979 or thereafter to determine whether there was a market for the software. The market in fact was small, with only approximately twenty companies, and the testimony indicated that plaintiff had neither the drive nor the expertise to market a software package in the way it should be marketed. Finally, the Government argues that when New Shelter began to develop the software, it did not consider the possible competitive disadvantage of marketing to competitors of its management division. Eventually, after the one and only sale of one component of the software in 1984, New Shelter decided to discontinue the marketing of the software because it did not want the software to be available to its competitors.

In response, five witnesses testified that Old Shelter planned to develop and market the software, and that the software was marketed and was discontinued for good reasons. Although Reynolds was critical of Shelter's marketing ability, he also testified that marketing the software was discussed with him prior to the reorganiza-

tion. Mickel, Wyche and Clark all testified that although they had not engaged in detailed discussions concerning the computer software, they were aware of Tuck's interest in the area.

d. Did Old Shelter have a substantial interest in First Piedmont Mortgage's portfolio?

Plaintiff contends that the real estate and loan portfolio of First Piedmont Mortgage represented a source of substantial value to Old Shelter as it contemplated the reorganization. The Government argues that Old Shelter had no profit expectation from the portfolio and simply wanted to make sure that it did not lose money; consequently, the portfolio was not a reason for the reorganization. In support of these contentions, the Government introduced evidence that Old Shelter did not have appraisals of the property updated; instead, Tuck looked at a "fact book" prepared by FPC which contained information regarding the properties and which was approximately two years out of date. In addition, 46 percent of the net book value of the real estate and the portfolio consisted of two properties: "Halter/Griffin" and "Tyger River." These were the only two properties that involved any major business opportunities. Further, they were industrial properties, whereas Old Shelter's development business was primarily residential and commercial. As a result, Bob Taylor, the head of Old Shelter's real estate division, declined to develop the Tyger River property and consequently the return on that property was disappointing.

Tuck, an experienced real estate developer, personally inspected the bulk of the property and concluded that the portfolio, worth over $9,000,000, presented plaintiff with the opportunity to liquidate and deploy significant assets in the business. Finally, plaintiff, as expected, realized a profit, although modest, on the sale of the properties in the mortgage portfolio.

e. Did Old Shelter have a substantial interest in FPC's bank stock?

Plaintiff contends that FPC's stockholdings in two South Carolina banks repre-

sented a source of potential value, and to Tuck they represented a "toehold" into a possible statewide banking arrangement. The Government argues that the facts refute both aspects of this assertion. It states that Tuck made no substantive plans regarding a formal banking arrangement nor did he reveal his ideas to others before the reorganization. Although the statewide banking arrangement never occurred, the stocks did appreciate following the reorganization. They were valued at $972,016 for purposes of the reorganization and subsequently were sold for $1,359,580. The plaintiff agrees, however, that the bank stock, alone, was not a significant reason for the reorganization.

4. Factors tending to corroborate a business purpose

a. Acquisition of a going corporation rather than a "shell" corporation

■ The financial condition of the acquired corporation is one factor which must be considered when determining the principal purpose of the transaction. U.S. Shelter has argued that it was an aggressive, growth oriented company with a policy of expansion and diversification. This policy is clearly evidenced by a review of the thirty-nine acquisitions which the parties stipulated U.S. Shelter completed between 1974 and 1986.

■ To justify this policy of expansion in a Section 269 case, the plaintiff is required to show that the acquired corporations were legitimate business entities possessing assets and actively engaged in the conduct of business at the time of the acquisition, and were not merely "shell corporations" with little other than operating losses.

■ In *Naeter Bros. Publishing Co. v. Commissioner*, 42 T.C. 1, 8 (1964), the Tax Court, in holding that tax avoidance was not the principal purpose of the transaction, stated, "[i]t can hardly be said that petitioner was acquiring a 'shell' corporation, which is often a significant fact in these cases." In that case, petitioner Naeter Brothers Publishing Company (NBP),

the publisher of a daily newspaper called the "Southwest Missourian," Naeter Brothers Realty (Realty), and Missourian Printing and Stationery Company (Missourian), an organization involved in job printing as well as the sale of office supplies and equipment, filed consolidated tax returns in 1956 and 1957. Members of the Naeter family were the majority stockholders as well as the chief executives of all three corporations. The family had essentially kept total control of the corporations since their respective formations in the early 1920's.

In 1953, a CPA was hired for the purpose of examining all aspects of the financial situation of the three corporations. The CPA recommended that the Naeters transfer their stock in Missourian to NBP. At a joint meeting of the respective boards of directors, the recommendation was accepted as a method of (1) eliminating intercompany indebtedness, (2) improving the financial position of the company to outside creditors, and (3) consolidating the balance sheets and profit and loss statements. The transfer of stock occurred in 1955.

After many years of profitability, Missourian operated at a loss between 1953 and 1957. This was mainly due to the printing operations of Missourian, and was attributed to changing conditions in the printing industry, obsolete equipment, and confused management conditions. After the transfer of stock, NBP enabled Missourian to purchase new equipment in hopes of improving the printing aspects of the organization. By 1957, a decision was made to liquidate the printing operation, and all of the equipment was sold. Missourian then concentrated on the merchandising aspects of the organization which had remained profitable.

The consolidated tax returns filed in 1956 and 1957 made use of the tax loss carryovers which Missourian had accrued. The Commissioner, however, disallowed the losses. The three organizations filed separate tax returns in 1958, 1959, and 1960, and all were operating at a profit.

In ruling for Naeter Brothers, the Tax Court held that Missourian had been a

profitable organization for many years and was not a mere shell. Further, it was expected that Missourian would soon return to profitability, and the acquisition of the stock by NBP was a solution which allowed it to reorganize and return to profitability. In addition, NBP loaned Missourian money which enabled it to maintain and re-equip the printing operations. It was more than two years after the acquisition before the decision was made to end that aspect of the operation.

In contrast, the Tax Court ruled against the petitioner in *Thomas E. Snyder Sons Co. v. Commissioner*, 34 T.C. 400 (1960), *aff'd*, 288 F.2d 36 (7th Cir.1961). In that case, petitioner was organized in 1949 and engaged in the business of developing and marketing cornpickers. Petitioner had net losses in 1950, 1951, 1952, and 1953. By 1953 petitioner was out of the cornpicker business. Benjamin Snyder acquired control of petitioner in 1953 by stock purchase. He transferred tank cars which he owned to petitioner for the transportation of molasses and merged into petitioner his wholly owned corporation which bought and sold molasses. Petitioner had profits in 1954, 1955, and 1956 from its molasses business. The Court held that Benjamin Snyder's principal purpose for acquiring control of petitioner was to evade or avoid federal income taxes by securing, as sole shareholder, the benefit of petitioner's net operating loss deductions, a benefit or deduction which he would not otherwise have enjoyed and that petitioner could not carry over its previous net operating losses against its profits for 1954, 1955, and 1956.

In support of its decision, the Tax Court stated that at the time of the acquisition, "petitioner was little more than a corporate shell with incurred losses" and sought "to carry over the losses of its abandoned business and set them off against the income from its new business." *Id.* at 408.

It is clear that FPC was not a "shell corporation." Although FPC's operations had been cut back significantly in order to remain a viable business concern, the record reflects that at the time of the reorganization, it was a very active corporation, engaged in a structured rebuilding program. FPC had survived a crisis period in its history and was in fact projecting near term profits at the time of the reorganization with Old Shelter.

FPC's components—Equipment Leasing, Computer Resources, and the mortgage portfolio—fit harmoniously with Old Shelter's business expansion. The record reflects that Old Shelter made substantial post-reorganization efforts to revitalize the FPC components. All efforts at revitalization were not successful. Nevertheless, the synergistic nature of the transaction yielded a business success for both FPC and Old Shelter, which, individually, neither could have achieved. *See Fairfield Communities Land Co. & Affiliated Subs. v. Commissioner*, 47 T.C.M.(CCH) 1194 (1984); *Elko Realty Co., v. Commissioner*, 29 T.C. 1012 (1958), *aff'd*, 260 F.2d 949 (3rd Cir.1958). The logical and compelling conclusion to be drawn from the evidence is that business considerations preponderated over tax considerations.

b.  Continuation of the acquired business

Another factor which courts have cited as evidence substantiating a business purpose is the post-acquisition continuation of the acquired or loss corporation. In *Naeter Brothers Publishing Co.*, petitioner acquired Missourian in January 1955 and operated it until late 1957, a period of almost three years. During this period, petitioner purchased new machinery and equipment and made other substantial investments on behalf of Missourian. In holding for the petitioner, the Tax Court found that "petitioner's purpose was to turn the printing division of Missourian into a profitable operation, and that this effort was abandoned only after it was proven futile." *Naeter Brothers Publishing Co.*, 42 T.C. at 8.

In *The Wallace Corporation v. Commissioner*, 23 T.C.M. (CCH) 39 (1964), a case involving I.R.C. Sections 172 and 382 as well as Section 269, the Tax Court, in finding for the petitioner, noted that "[d]uring the period from January 3, 1958, to June

30, 1959, petitioner continued to carry on a trade or business substantially the same as that conducted before this period." *Id.* at 48. However, losses were disallowed in *American Pipe & Steel Corporation v. Commissioner,* 25 T.C. 351 (1955), *aff'd,* 243 F.2d 125 (9th Cir.1957) where the Ninth Circuit stated: "The fact that within two months of acquisition [the loss corporation] was a mere corporate shell is highly significant as militating against petitioner's contention of his non-tax motivation." *Id.* at 128.

Although there is no prescribed time period for carrying on the operations of a loss corporation, it appears that the continuation of the business for two or more years is a reasonable indication that there are *bona fide* non-tax motivated business purposes involved. In the case at hand, New Shelter continued to operate Equipment Leasing until June 1983, a period of three and one-half years from the date of the reorganization. At that time, it was sold to American Federal Savings and Loan, which continues to operate it today. Further, New Shelter continued to operate Computer Resources until May 1984, a period of four and one-half years from the time of the reorganization. At that time, New Shelter sold the computer lists of Computer Resources to Control Data, Inc. However, New Shelter retained most of the computer equipment and twenty-four of forty-two employees for the purpose of performing New Shelter's in-house computer needs. New Shelter had been a major client of Computer Resources prior to the sale in 1984. New Shelter continued to operate the businesses of FPC rather than terminate them immediately after the reorganization.

### c. Efforts to make FPC profitable

■ Implicit in the corroborating factor of continuing the operations of the loss corporation is the requirement that petitioner must attempt to make the loss corporation profitable. The Tax Court in *Naeter Brothers Publishing Co.,* 42 T.C. at 8, in holding for petitioner, stated that "petitioner's purpose was to turn the printing division of Missourian into a profitable opera-

tion." Evidence of this is the fact that Naeter Brothers made several sizable loans to Missourian in an attempt to return it to profitable operation.

Another case where the Court looked to efforts of the petitioner to improve the financial situation of a loss corporation is *Arwood Corp. v. Commissioner,* 30 T.C.M. (CCH) 6 (1971). *Arwood Corp.* involved the merger of several corporations involved in the manufacturing and sale of parts produced to customer specifications and designs from dies by the use of the investment casting process.

In 1945, Mercast Corporation (Mercast) was incorporated for the purpose of developing and exploiting a patented process useful in the investment casting field and employing frozen mercury (the "Mercast" process). Between 1951 and 1956, Mercast acquired all the outstanding stock in two other investment casting companies, Alloy Precision Casting Company (Alloy), and Industrial Metal Casting Corporation (Manufacturing).

In 1943, what was eventually known as Arwood Precision Casting Corporation (APC), was formed to compete in the investment casting business. APC used the "Solid Mold" method of investment casting and began attempts to develop the "Ceramic Shell" technique in 1953. This research was undertaken because APC was unable to manufacture parts larger than one inch in any dimension and more than one ounce in weight using the "Solid Mold" process.

In 1957, APC was informed by a manufacturer's representative of the possibility of acquiring Alloy and Manufacturing. APC contacted Atlas Corporation, which controlled Mercast (the parent corporation of Alloy and Manufacturing) throughout the period of 1955–1960, but it was not interested in selling the companies. APC was again informed of the possibility of acquiring the companies in 1959, and upon inquiry found that Atlas was interested in the sale.

When negotiations with Atlas began, APC had no financial information concerning Alloy and Manufacturing and did not

know that they were operating at a loss. After several meetings with Atlas, APC officers became aware of the loss, and Atlas representatives pointed out the potential tax benefits of the loss carryover. APC considered the continued operating losses to be a serious deterrent to the acquisition because of APC's lack of financial resources to support the continuation of the losses.

At this time APC had not yet successfully developed the "Ceramic Shell" casting technology. APC was motivated to agree to the merger because of the use of the "Mercast" process by Alloy and in hopes of reorganizing the acquired companies into a profitable operation.

The acquisition was carried out by the merger of Manufacturing into Alloy and then APC into Alloy. The name was then changed to Arwood. This was done to protect the "Mercast" patent which Alloy possessed.

After the merger, Arwood spent a great deal of time and effort reorganizing the newly acquired plants in the belief that the previous operating losses were caused by poor marketing and management. This included an investment of over $230,000 in additional equipment and buildings. Within a year after the acquisition, APC was able to produce castings greater than 24 inches in size and up to 100 pounds.

APC used losses stemming from the operation of Alloy and Manufacturing between the years 1955 and 1959 as net operating loss carryovers between 1960 and 1965. APC claimed that the principal purpose of the merger was the acquisition of the technical knowledge which the acquired companies retained. The Commissioner ruled that the principal purpose was the evasion or avoidance of taxes.

In ruling for petitioner, the Tax Court found the factors discussed above were "inconsistent with respondent's contention that the merger of the three companies took place in order to achieve the acquisition of tax losses." *Arwood Corp.*, 30 T.C.M. (CCH) at 21.

In contrast, the Tax Court disallowed loss carryovers where an acquiring corporation expended little effort to return a loss corporation to profitability. Evidence of this complacency was the fact that the acquiring corporation entered into contracts for only six months and discontinued the acquired business less than seven months after the acquisition. *F.C. Publication Liquidating Corp. v. Commissioner*, 36 T.C. 836 (1961), aff'd, 304 F.2d 779 (2nd Cir.1962).

U.S. Shelter made substantial efforts to insure the profitability of the operating divisions of FPC.

Its efforts to improve the profits of Computer Resources included the following: hiring a new president, purchasing the outstanding 20 percent minority stock interest, upgrading the computer equipment in 1979, 1980, 1982, 1983 and 1984, acquiring the Columbia and Charleston bureaus of Computer Resources, a competing company, and providing loans totaling more than $800,000 between 1979 and 1983.

With regard to Equipment Leasing, New Shelter obtained and guaranteed new lines of credit from at least six banks. The amount of each line of credit ranged from $250,000 to $2.6 million with a total of approximately $7 million. These lines of credit allowed Equipment Leasing to double the number of leases between 1979 and 1983 and to increase the value of the lease portfolio from approximately $6.9 million to $10.1 million. In addition, the shareholders of New Shelter approved the adoption of a stock option plan entitled "The U.S. Shelter Corporation 1980 Long–Term Incentive Plan" and authorized the issuance of stock options to employees. Between 1980 and 1982, approximately 480,000 options were awarded to employees.

Plaintiff also realized a profit on the sale of the properties in the mortgage portfolio.

The actions of New Shelter in carrying on the businesses of FPC indicate that substantial business purposes motivated the transaction and that these purposes, when taken together, far outweigh plaintiff's desire to take advantage of FPC loss carryovers.

**d. Value of FPC v. magnitude of NOLs**

█ The Government argues that the principal component of FPC's value—no matter how the value is calculated—was the magnitude of the tax benefits.

The parties stipulated that the net book value of FPC as of June 30, 1979, was $1,838,000, and as of November 30, 1979 was $1,717,000. Clark, president of FPC, testified that he viewed the book value as a fair value for purposes of the exchange. Page, executive vice president of FPC, testified that the value of FPC was analyzed several ways and it was determined that book value was a reasonable basis on which to value the company. Orders, chairman of the board of FPC, testified "we priced our company based on the hard assets...." and "we put in our 20 percent strictly on the asset value as appraised...." Finally, Tuck testified that Old Shelter "bought First Piedmont on its book value...."

The Government has argued that, in general, book value does not represent actual value and has suggested several alternative methods for valuation which should have been used. Among these are the "dilution cost" that Old Shelter paid to acquire FPC, the trading price of FPC's stock, and a multiple of FPC's earnings.

The "dilution cost" of FPC which the Government espouses was $1,541,170 and is arrived at in the following manner. Old Shelter exchanged assets valued at $7,748,595 for 80.1 percent of FPC's stock. The 19.9 percent dilution of ownership multiplied by the amount of the assets exchanged equals $1,541,970. This argument, however, is flawed by the exclusion of the assets which FPC brought to the deal.

The stock price for FPC consistently ranged between ¾ and ⅞ for the two years preceding the reorganization. The stock was trading at ⅞ (0.875) on July 26, 1979, the last trading day prior to the announcement of the Reorganization Agreement. The local quotation committee temporarily suspended quotations at that time and resumed quotations after the reorganization on November 30, 1979. After the reorganization, the stock traded between $2 and $5 per share through 1981. When multiplied, (0.875 × 967,868 outstanding shares), a stock value of $846,884 is obtained. However, neither Clark nor Page believed that the stock price was a fair measure of FPC's value. Page testified that the stock price did not recognize the future potential of FPC which its management felt existed. This was primarily attributed to problems which FPC had experienced in the past.

The third method of valuation proposed by the Government is a multiple of FPC's earnings. This method is not useful because, as Page testified, FPC had lost money in 1978, and a multiple of earnings valuation was not significant.

The Government argues that even if the correct value of FPC was book value, $1,717,000, that FPC's tax benefits were worth $1,364,000 and constituted 79 percent of FPC's total value. This figure is arrived at by multiplying $3.4 million (income which would be sheltered from tax) times the then marginal tax rate (46 percent) which equals $1,564,000 and subtracting $200,000 (minimum tax) to attain a net tax savings of $1,346,000 from FPC's NOLs.

The Government's line of reasoning, although perhaps appropriate when dealing with "shell corporations," is not persuasive in the instant case. At the time of the reorganization, FPC had assets worth approximately $17 million, including a number of single assets including bank stocks, real estate and loans outstanding, which the parties stipulated were worth anywhere between $900,000 and 1.7 million.[17] To single out the NOLs provides a distorted view of the transaction, especially given the fact that the uncontroverted testimony of all of the principals was that absolutely no value was placed on the NOLs for purposes of the transaction. The value of the NOLs takes on even less significance when compared to the combined assets of the companies, the purchase price paid by Old Shel-

---

17. At the time of the reorganization, FPC also had liabilities of approximately $15.3 million and a net book value of approximately $1.8 million.

ter, and the capital invested after the reorganization to expand the FPC businesses.

Even though the amount of the NOLs is large when compared to the book value of FPC, it is by no means determinative. Rather, the NOLs are but one of the factors which the Court must analyze when determining the principal purpose of the transaction. In considering the size of the loss carryovers, courts have compared the size of the loss to the purchase price of the acquired corporation, however, Section 269 has been found to be inapplicable even in cases where the losses exceeded the cost of the acquired corporation.

This issue was addressed by the Tax Court in *Stange Co.* In ruling that tax avoidance was not petitioner's principal purpose in acquiring a loss corporation, the Tax Court noted that "the magnitude of the recognized tax saving does have a bearing on its importance." *Stange Co.,* 36 T.C.M. (CCH) at 39. However, the Court elaborated on this point stating:

> Respondent would have us compare this savings to the combined book value of [the companies] and conclude that its magnitude mandates that it be the principal purpose for the acquisitions. We do not agree. Any such consideration could be only one of many factors; it does not conclusively establish its importance.

*Id.* n. 13.

In *Daytona Beach Kennel Club v. Commissioner,* 69 T.C. 1015 (1978), the Tax Court also ruled for petitioner and stated:

> We must agree with petitioner's assertion that an approximate $983,293.11 cost for a net operating loss of at most $1,194,297.65, ... does not cause such a distortion of Daytona Beaches' income as to prove that a preconceived plan of stock purchase and merger existed or that the principal for structuring the transaction as it was structured was tax avoidance.

*Id.* at 1032.

The Court is not persuaded by the Government's argument that the ratio of tax benefits to the value of FPC in this instance calls for a finding of a tax avoidance purpose. Other positive business factors in the transaction inuring to the benefit of both FPC and Old Shelter far outweigh such a conclusion and preclude an inference that the size of tax benefits was so overwhelming to be the principal purpose.

## V. CONCLUSION

After carefully considering the facts and applicable law, the Court concludes that the FPC/Shelter transaction was entered into for the principal purpose of business expansion, including becoming a public company and acquiring the business assets of FPC, not for the principal purpose of tax avoidance.

The reorganization enabled Old Shelter to become a public company, which made it a better vehicle for growth and diversification. The acquisition of the business assets of FPC (its equipment leasing, computer services, mortgage portfolio, personnel, and goodwill) was also an important element of the transaction. Both reasons fit into the profile of Old Shelter, and they enabled New Shelter to grow into a multi-million dollar corporation. FPC benefited from Old Shelter's profitable business, large capital base, and borrowing power. Both companies substantially increased the value of their stock for the benefit of the respective shareholders.

The growth of New Shelter, however, was not without problems. New Shelter had to deal with changing business conditions, and in some instances discontinued its emphasis on expanding the business assets acquired from FPC. Nevertheless, taken as a whole, the evidence establishes by a strong preponderance that the intent and motive at the time of the transaction was primarily business motivated and not motivated by tax avoidance. The ensuing success in building New Shelter into a large public company corroborates that conclusion.

The tax benefits of FPC were important but incidental to Old Shelter. Their availability allowed New Shelter more flexibility in its aggressive business development.

The evidence clearly establishes that Old Shelter was primarily interested in business growth, and the acquisition of FPC provided an appropriate vehicle at an appropriate time to accomplish that business purpose. Together the two companies could accomplish business purposes which they could not accomplish separately, and accordingly, the transaction made good business sense.

All other arguments raised by the parties and not addressed herein have been reviewed by the Court and found to be unpersuasive.

Plaintiff is entitled to a refund.

It is hereby ordered that the parties shall stipulate to the amount of such refund consistent with this opinion and the stipulation for partial dismissal heretofore filed with the Court. Such stipulation shall be filed with the Court within thirty (30) days from the date of this Opinion. In the event the parties are unable to agree on the calculations, they shall file a joint status report advising the Court accordingly, at which time the Court will set a hearing to determine the exact amount of recovery.

IT IS SO ORDERED.

APPENDIX A

BEFORE THE REORGANIZATION

APPENDIX B

THE REORGANIZATION

## APPENDIX C

### AFTER THE REORGANIZATION